146 N.J. Super. 419 (1976)
370 A.2d 27
JOHN DOE AND MARY DOE, HIS WIFE, AN ALIAS, PLAINTIFFS-RESPONDENTS,
v.
G.D. DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1976.
Decided December 16, 1976.
*422 Before Judges BISCHOFF, MORGAN and E. GAULKIN.
Mr. William Hodes argued the cause for appellant-natural mother (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Steven Zamrin, law guardian, Assistant Deputy Public Defender, argued the cause for juvenile-appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
*423 Mr. David J. Meeker argued the cause for respondents.
The opinion of the court was delivered by BISCHOFF, J.A.D.
G.D., the natural mother of N.D. an infant, and N.D. appeal from an order entered in the Juvenile and Domestic Relations Court directing that "physical custody of the infant N.D. be and is hereby continued with the foster parents, known as John and Mary Doe, plaintiffs in this matter under the supervision of the New Jersey Division of Youth and Family Services." The order was entered at the termination of proceedings instituted under N.J.S.A. 9:6-8.8 et seq.
N.D. was born out of wedlock to G.D. on December 8, 1972. G., then 17 years of age, did not have facilities to house or care for N., who was given to the New Jersey Division of Youth and Family Services (hereinafter Division or DYFS) which Division, in turn, placed her in a foster home.
DYFS assigned plaintiffs as foster parents in September 1973 and N. remained in their custody until December 1974 with N. visiting G. through arrangements made with the Division. In December 1974, on one such visitation, G. retained possession of N., who remained with G. until August 1, 1975, when her custody was terminated by court order.
The present controversy commenced with the filing of a verified complaint on July 22, 1975, entiled "John Doe and his wife, Mary, an alias, plaintiffs v. G.D." The complaint, filed pursuant to N.J.S.A. 9:6-8.34(d),[1] charged G. with neglect of N. and asked that he court appoint DYFS guardian of N. "until a full hearing" could be held and, further, *424 that plaintiffs be awarded physical possession of the child.
Based on the testimony of a caseworker of DYFS and affidavits accompanying the verified complaint, an order to show cause and an order of protection (N.J.S.A. 9:6-8.55) were entered which placed N. in the care, custody and guardianship of DYFS and "in the temporary custody of plaintiffs." The order further directed defendant G. to show cause on July 31, 1975 "for the purpose of a factfinding hearing pursuant to N.J.S.A. 9:6-8.44."
A law guardian for N. was appointed pursuant to N.J.S.A. 9:6-8.21(d)[2] and N.J.S.A. 9:6-8.23[3], and counsel was provided for G.D. On July 31, 1975 hearings were commenced and continued on August 1st.
On August 1, DYFS filed a verified complaint in the Juvenile and Domestic Relations Court seeking a judgment placing N.D. in the guardianship of the Division pursuant to N.J.S.A. 30:4C-15(c)[4] and N.J.S.A. 30:4C-20[5].
*425 At the conclusion of the hearing on August 1 an order was entered placing N. in the custody of the Division pending a plenary fact-finding hearing which was scheduled for September 11.
An appeal was taken from this order by the law guardian for N. (Docket A-118-75)[6]. Fact-finding hearings were held on several dates following September 11, and terminating November 14, with the court delivering an oral opinion on November 17. The oral opinion was followed by the entry of an order on December 1, 1975. The oral opinion and the order included the specific finding that:
[T]he infant N.D. is and has been an abused and neglected child within the definition of N.J.S.A. 9:6-8.21 § 4, and this court having further found that said abuse and neglect is and has been the result of acts and omissions by the parent G.D.R. and it appearing that good cause exists, and the best interests of the infant N.D. require the entry of the within Order.
The order provided that: (1) physical custody of N. was continued in the foster parents (plaintiffs) under the supervision of DYFS; and (2) G.D. was permitted visitation of N. one day a week.
*426 The order contains other provisions pertaining to the monitoring of visits by DYFS and the offering of mental health services, occupational rehabilitation services and other services to G.
The law guardian on behalf of N.D. appealed from the "adjudication of child abuse entered on November 17, 1975" (Docket A-1013-75). G. appealed from the same adjudication (Docket A-1424-75).
All three appeals are hereby consolidated and will be disposed of in this opinion[7].
The appellants advance two basic arguments on this appeal: first, the adjudication that N. was an abused and neglected child was against the weight of the evidence, and second, that the trial judge did not properly apply the standards established by N.J.S.A. 9:6-8.21(c)(4) in reaching its conclusion.
The record discloses the following pertinent facts.
While N. was living with her foster parents and visiting her natural mother, upon her return to the foster home her condition was described as "filthy" and her clothes were "dirty." When she resumed living with G. in December 1974, it was in a three-room apartment where, in addition to G. and N., five adults and three children resided. G. moved from it to another apartment, which she shared with a woman and the woman's children. Thereafter, G. moved into her own apartment, where she lived with O.R., who has since become G.'s husband. That apartment provided shelter for another child and two teen-aged girls. For awhile N., slept on a foldout couch with the two girls. N. was described by the caseworker as being in poor health for a *427 few weeks prior to April 1975 and she had gained only one-half pound in the six-month period prior thereto. As opposed to this, there was testimony that she was never ill while in the custody of plaintiffs. The apartment where N. lived with G. in July 1975 was described as disorganized and filthy. N. did not have a bed of her own and was observed playing with cockroaches.
After December 1974 the plaintiffs had visitation with N., which visits were initiated at the request of the caseworker with the consent of G. These visits gradually stretched to weekends. Plaintiffs testified that in the Spring of 1975, whenever N. came to visit she was extremely thin, sickly and "filthy dirty" and began using slang and obscene language. The caseworker testified that whenever she returned N. to G. after these visits N. became hysterical and referred to Mrs. Doe as "Mommy."
Two psychiatrists, specializing in child psychology, testified. Dr. Breckenridge testified that she saw N. on two occasions, one in the company of plaintiffs on July 7, 1975 and the other with G. on July 16, 1975. When she observed the child with her foster parents, N. sat in their laps and, while she was originally inhibited, she eventually began to respond and examined toys in the doctor's office. Her speech was adequate and she appeared to have a warm relationship with the foster parents.
On the occasion of her examination on July 16, G. told the doctor that N. was having nightmares and would scream and throw things. N. was also observed by others rocking and biting her nails. The doctor concluded that N. was controlling G. rather than G. controlling N., and found G. to be immature, of inadequate personality and poor ego strength. She found that N. showed signs of emotional disturbance evidenced by nightmares and nail-biting; she called it maternal deprivation and stated that if the situation did not change, N. would suffer from chronic deprivation, show signs of increasing mental disturbance and become a sociopath or psychopath. She further stated that N.'s emotional *428 condition was in imminent danger because of G.'s failure to provide proper supervision. She recommended that N. not be returned to her natural mother.
Dr. Samuel Levine, like Dr. Breckenridge, recommended that N. not be returned to G. However, he was unable to say that G. was not a fit mother. Nor could he predict whether N. would become a sociopath or psychopath if returned to G., though he expressed the opinion that it would be in N.'s best interests to remain with the foster parents. He stated that N. lived with the foster parents until she was 2 1/2 years old, which resulted in conflicts between G. and N. due in part to (1) N.'s detachment from G. and her inability to recognize G. as her mother, and (2) N.'s adjustment to the environment of the foster parents.
In his oral opinion the trial judge made the observation that G. "had an affirmative duty to seek out, obtain and attempt to develop homemaking and parenting skills in view of the return of the child N.D. to her custody," and did not do so; further, that once N. returned to G. in December 1974 "it was tragic to renew the visitation of the child N. into the foster home." He found, as a fact, that the living accommodations provided N. by G. were "unacceptable by reasonable standards." The judge considered the term "education" contained in the statute (N.J.S.A. 9:6-8.21 (c)(4)(a)) and held that G. was unable to provide such of N.'s minimal needs as would allow the child to grow and develop "mentally," and referred, specifically, to intangibles which an adult "freed of the narrow lifestyle that G. presently finds herself to be in could provide for a child." Further, that he was satisfied that the child must be allowed to "continue to grow in the present environment [with the foster parents] in its best interests."
The trial judge further found that while N. had not been subjected to physical injury or abuse, her mental and emotional health were in imminent danger of being impaired. The standard applied by the trial judge in reaching *429 this conclusion and his reasons for doing so appear from the following:
* * * The record as I have indicated shows that custody of the child was regained by the mother sometime in December of 1974. In the following six months the child remained with the mother until regained by the foster parents. While N. was with her mother G. received assistance presumably from the Union County Welfare Board. Thus she was financially able to provide at least minimal shelter for the child. Even assuming arguendo that the mother was completely impoverished and without assistance she would still be under a duty to provide minimally adequate shelter. If need be and as a last resort she could apply to the Division for emergency aid or other arrangement. Thus a fair reading of Title 9 would have to mean that neglect may result when a parent fails to provide a minimum degree of shelter for a child necessary to prevent emotional impairment regardless of financial means. In the span of six months while N. was with her mother they lived at three different addresses. This alone does not ever violate the statute and cannot. But for example at the Linden address G. and N. lived with Mrs. (name), the brother c., the four grandchildren under such relatively crowded conditions that N. shared a bed with another child. The lack of a crib, the lack of some private or semi private sleeping area as referred to, the required sharing of a sofa bed with the other non children in the various apartments sufficiently satisfies and crosses the evidential preponderance threshold required by this statute in its composite totality. This court therefore finds that there has been a showing of neglect of the child N.
It is clear that the judge used an improper standard in reaching his conclusion. N.J.S.A. 9:6-8.21 provides in pertinent part:
As used in this act, unless the specific context indicates otherwise:

* * * * * * * *
c. "Abused or neglected child" means a child less than 18 years of age whose parent or guardian, as herein defined,

* * * * * * * *
(4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so * * *.
*430 This definition is part of L. 194, c. 119, entitled, "An Act concerning the manner of disposition of cases of child abuse or neglect * * *." This statute, effective October 10, 1974, made extensive revisions in the child abuse laws. However, we focus on the single issue presented which constitutes the basis for the action of the trial judge in removing N. from the custody of her natural mother and placing her with the foster parents for a period of one year.
Examination of the standard required by the statute for a finding of child abuse or neglect suggests that, at a minimum, there should be a finding that (1) the child has a physical, mental or emotional condition that is either impaired or in imminent danger of being impaired; (2) such impairment is or would be the result of the parent's failure to exercise a minimum degree of care in supplying the child with adequate food, clothing, shelter, education, medical or surgical care, and (3) even though financially able to do so or, through offered aid, is able to do so.
The finding of the trial judge that N. was not suffering from any "physical injury" but was suffering either from some mental or emotional impairment or was in imminent danger of sustaining some mental or emotional impairment should she be returned to G. has support in the record. The record also supports the conclusion of the trial judge that the best interests of the child would be served by continuing her custody in the plaintiffs. However, "the best interests of the child" is not the standard adopted by this statute as the basis for removing a child from the physical care and custody of the parents and placing it elsewhere. While the "best interests of the child" may be the standard applicable in other proceedings (see e.g., In re Adoption of E., 59 N.J. 36, 45 (1971) (adoption proceedings)), it is not the standard to be applied in proceedings under the statute here involved.
Wholly apart from the judge's articulation of his understanding of the statutory standard, it is clear from an examination of his findings and the emphasis in his opinion *431 that he misconceived the nature and basis for the proceeding. First, he emphasized the unacceptability of substandard, dirty and inadequate sleeping conditions. While they may be unfortunate incidents of poverty, they do not establish child neglect or abuse. Adoption of such facts as a basis for a finding of child neglect or abuse might result in mass transfers of children from ghettos and disadvantaged areas into more luxurious living accommodations but with resultant destruction of the natural parental bond. This clearly was not the design of the statute nor the intent of the Legislature. Cf. Spence-Chapin Adoption Service v. Polk, 29 N.Y.2d 196, 324 N.Y.S.2d 937, 274 N.E.2d 431 (Ct. App. 1971).
Equally inappropriate was the trial court's conclusion that N. was neglected or abused because of G.'s failure to educate or provide her with intellectual stimulation. The reference to education contained in N.J.S.A. 9:6-8.21 (c) (4) (a) concerns parental encouragement to truancy of a school age child, or other interference with normal educative processes. It does not, and cannot, have reference to the more subtle and intangible incidents of a home environment of a preschool infant which hopefully would encourage beneficial intellectual growth; to so hold would be to sanction state intrusion into the personal relationship between parent and child to an intolerable degree and would impermissibly impair the normal prerogatives of parenthood. The enactment was never meant to provide governmental monitoring of these intimate details of the parent-child relationship.
The rejection of DYFS's advice with respect to the rearing of the child, viewed by the trial judge as being of significance, was unremarkable and without relevance to the standards set forth in the statute for depriving a natural parent of her child's custody. It must be emphasized that G.'s original placement of the child with DYFS was voluntary on her part; N. was placed with the agency only because G. was at the time unable to provide her with care. *432 Thereafter, despite G.'s repeated requests for the return of her child, the agency retained custody and, from the record, that appears to have been without G.'s consent. In those circumstances, G. was not bound by agency instructions; she was entitled to the return of her child since there was at no time any adjudication that she was an unfit mother. A parent's right to custody of her child, otherwise unquestioned, cannot be conditioned upon her obeying advice of DYFS concerning its rearing.
A careful study of the opinions of the two psychiatrists leads to the conclusion that whatever the diagnosis or prognosis of N.'s mental and emotional condition may be, it is not caused by conditions existing in either the home life provided by G. or that provided by the foster parents. It is firmly grounded in the trauma resulting from being shuttled between the two divergent and conflicting environments. That fact was recognized by the trial judge when he stated:
It was tragic to renew the visitation of the child N. into the foster home.

* * * * * * * *
And I find as a fact, not by something or some things occurring before December, 1974, while in foster care, but directly as a result of the child being frightened by being put back into a visitation arrangement or situation between G. and the foster parents, at first overnight and then by weekends and as a direct stressful consequence of such arrangement evidenced by these signs of rocking and nightdreams * * *
The trial judge placed direct responsibility for this shuttling visitation procedure upon G. The record does not support that conclusion; rather, it reflects the fact that the visits occurring after December of 1974, when N. was in the physical care and custody of G. were requested of a caseworker from DYFS by the plaintiffs-foster parents and acquiesced in by DYFS. The visits, in all instances, were arranged by and through DYFS and, if responsibility is to be assigned for this visitation procedure, it must rest upon the agency.
*433 We are mindful that for the past year N. has been in the physical care and custody of the foster parents with visitation allowed G. once a week. The sensitive nature of such an order and its potential for harm is recognized in the statute, which gives an appeal from such an order preference "over all other matters." N.J.S.A. 9:6-8.70. Unfortunately, the parties here did not apply for acceleration pursuant thereto immediately upon the filing of this appeal. Therefore, rather than direct a remand at this time for the application of the proper standard to the facts appearing in the record, we elect to exercise our original jurisdiction. R. 2:10-5.
We have carefully reviewed the entire record and conclude that the proofs do not establish that G. was guilty of child neglect or abuse. Although the record shows a child living under poverty conditions, mentally and emotionally impaired or in imminent danger of becoming mentally or emotionally impaired, such condition is due in large part to trauma induced by living in two households with widely disparate environments. This situation has been aggravated by the existing order of court which permitted such conditions to continue.
We reverse the order entered below and remand for the entry of an order returning the custody and physical care of N. to her natural mother, G.D.R. terminating all rights of visitation by the foster parents, plaintiffs herein, and continuing the supervision of DYFS.
NOTES
[1] N.J.S.A. 9:6-8.34 provides:

The following persons may originate a proceeding under this act:
* * * * * * * *
d. Any person having knowledge or information of a nature which convinces him that a child is abused or neglected.
[2] N.J.S.A. 9:6-8.21 provides:

"As used in this act, unless the specific context indicates otherwise:
* * * * * * * *
d. `Law guardian,' means an attorney admitted to the practice of law in this State, regularly employed by the Office of the Public Defender, and designated under this act to represent minors in alleged cases of child abuse or neglect."
[3] N.J.S.A. 9:6-8.23 provides:

"a. Any minor who is the subject of a child abuse or neglect proceeding under this act must be represented by a law guardian to help protect his interests and to help him express his wishes to the court. However, nothing in this act shall be construed to preclude any other interested person or agency from appearing by counsel.
b. The juvenile and domestic relations court, on its own motion, will make appointments of law guardians."
[4] N.J.S.A. 30:4C-15 provides:

* * * * * * * *
Whenever (c) it appears that the best interests of any child under the care or custody of the Bureau of Childrens Services require that he be placed under guardianship * * * a petition, setting forth the facts in the case, may be filed with the juvenile and domestic relations court of the county where such child may be at the time of the filing of such petition. A petition as provided in this section may be filed by any person or any association or agency, interested in such child, or by the Bureau of Childrens Services in the circumstances set forth in items (c) and (d) hereof.
[5] N.J.S.A. 30:4C-20 provides:

If upon the completion of such hearing the court is satisfied that the best interests of such child require that he be placed under proper guardianship, such court shall make an order terminating parental rights and committing such child to the guardianship and control of the Bureau of Childrens Services, and such child shall thereupon become the legal ward of such bureau, and such bureau shall be the legal guardian of such child for all purposes, including the placement of such child for adoption.
[6] N.J.S.A. 9:6-8.70 authorizes appeals from interlocutory orders "as of right."
[7] The complaint filed by DYFS pursuant to N.J.S.A. 30:4C-15(c) and 30:4C-20 was apparently dismissed by the court during the course of the oral opinion in the following language: "[A] motion to withdraw that complaint will be considered and granted without prejudice to refile same or it may be left with the court on file, to be renewed at an appropriate time." No formal order was entered and no appeal has been taken from this determination.