NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF, v. C. M., DEFENDANT.

IN THE MATTER OF M., E., D., MINORS.

Juvenile and Domestic Relations Court
Camden County

August 12, 1981.

*James R. Zazzali*, Attorney General of New Jersey, for Division of Youth and Family Services (*John J. Chernoski* and *Pamela Killman*, Deputies Attorney General, appearing).

*Leonard A. Cinaglia* for defendant C. M.

*James H. Klein*, law guardian for the M. children, M., E., D.

PAGE, J. S. C. (temporarily assigned).

Child abuse and neglect is claimed by the New Jersey Division of Youth and Family Services (DYFS) as to three children, ages six, five and one. The effect of their mother's alleged chronic mental illness upon the children's mental and emotional well-being is the basis for this action brought under the provisions of *N.J.S.A.* 9:6–8.21 and *N.J.S.A.* 30:4C–12.

Defendant C. M. has a long history of chronic schizophrenia. She has previously been hospitalized at the County Psychiatric Hospital at Lakeland. The children here involved are the three remaining with her of a total of seven. The other four children were previously placed in foster care several years ago and guardianship over them has now been awarded to DYFS in a separate action.

On February 11, 1981 this court issued an order to show cause with temporary removal of the children upon the verified complaint and affidavits. The court held substantial factfinding hearings; lay and expert witnesses were presented.

At the time of their removal the children, M. (born 12–4–74), E. (born 4–18–76) and D. (born 7–21–80), were residing with their mother, C. M., on the White Horse Pike in Lindenwold. The family was well-known to all of the social service agencies in Camden County, including DYFS, school authorities, the welfare board, the Department of Health, and the Visiting Nurse Association. All had attempted at one time or another to provide services to C. M. and her children.

C. M. was last discharged from the Psychiatric Hospital at Lakeland on October 19, 1970 with a final diagnosis of "Schizophrenia, residual type." Although follow-up treatment on an out-patient basis with continued medication was recommended,

C. M. complied for a short period and then was no longer receptive to continued visits or medication.

Beginning in the summer of 1979 she rented her present housing. From the outset there were complaints from the owner, Herman Kruckner, that the home was in substantial disarray. He testified that he had observed her section of the two-family house to be in very disorderly condition: clothes strewn all about and food left spoiling on the tables. He complained about her lack of housekeeping and received complaints from the other tenants that the property had become roach-infested from the debris contained in her apartment. He arranged to exterminate the roaches but they reappeared some three months later. He claimed that the situation continued, with dirty dishes, clothes, and food all through the house. On this basis he called the board of health in the spring of 1980 and sought to evict C. M. He discussed his concerns with her on many occasions. Each time she promised to do better. Finally, in March 1981 he went to the home and was told by C. M. that her children had been taken away. At that time he found the house very clean.

Witnesses representing four separate agencies testified as to the deplorable condition of C. M.'s house. It was described as "in bad condition," "filthy," "heavily infested with roaches," "cluttered with dirty clothes," "dirty dishes and spoiled food on the tables," and "always littered with bags of groceries and clothing." As to the children themselves, all witnesses testified that they were usually dirty and dressed in ill-fitting and inappropriate clothing. The children were well fed and appeared happy, although having a somewhat flat effect.

Three representatives of the Lindenwold School District testified as to their experiences with C. M. and two of her children, M. and E. Both children were enrolled in special classes conducted by the school district for "children who are developmentally delayed." M., the oldest, was enrolled in September 1979 and attended sporadically until February 1980 when C. M. took her out of the school program. She was present 57 days and absent 41 days during this period. Thereafter, in the school

year 1980–81 M. was enrolled in a special kindergarten program in a different school until her court removal and foster-care placement. Her sibling, E., was enrolled in the special education class on September 18, 1980 but was taken out of school on October 10, 1980; he was readmitted on December 2, 1980 and remained until February 10, 1981, at the time of his removal from the home. E. was present 37 days and absent 19 days during this period. C. M.'s relationship with the school authorities was strained at best. The children's continued absences resulted in inquiries being made from the school officials to C. M., who offered a variety of different excuses, including lack of ability to transport them even though they lived directly across the street from the school. Notes from C. M. to the teacher and school nurse were disorganized and disjointed. Finally, in February 1980 after the school nurse tried to contact C. M.'s social worker, Hirsch, to obtain his assistance with the problem, C. M. became "very upset that I had tried to contact Mr. Hirsch" and withdrew M. from the school for the rest of the year. She complained in a "hostile and agitated" manner that "I should keep my nose out of other people's business." C. M. contended that the school authorities were attempting to take her remaining children away from her.

As to the children's appearance and behavior in school, the school authorities testified that they were seriously developmentally delayed. Her teacher noted that M. scored "very, very low" on all the tests and would only respond to questions and would not readily verbalize in the classroom. Likewise, the younger E. only answered "yes" or "no" to questions and would not interact with the other children, even at play. He was clothed in diapers and "just sat there and watched." "The other children treated him like a younger brother." Several times C. M. brought the children for classes at the wrong time, in the afternoon, although both were scheduled for morning classes.

Four expert witnesses testified as to the childrens' problems and C. M.'s mental illness. Dr. Charles Bassman, a licensed clinical psychologist, on the staff of Our Lady of Lourdes Hospital, testified to his encounters with C. M. and the children

at the hospital's Child Development Center. He had tested both M. and E. and seen them on several occasions from December 5, 1979 up to April 21, 1981, both before and after their court removal. Dr. Bassman stated that both children were suffering from developmental disabilities as a result of environmental and social deprivation. He stated that M. had a far greater potential than her tested I.Q. score of 87, and E. had greater potential than his I.Q. score of 71 which would place him in the borderline mentally-retarded range. Dr. Bassman subsequently retested both children in April 1981, nine weeks after their foster placement. In M. he noted significant gain in functioning in all areas of testing, which would currently indicate "at least average intelligence." He also noted that M. was now "much more verbal," with many positive changes in her interrelationships with others. As to E., the latest findings were described "quite remarkable." He originally tested at the 2½–year level in December 1979; he was now functioning at the 4–year, 9–month level. Dr. Bassman gave his opinion that this "substantial improvement" was due to the nurturing, stimulation and different educational setting in his new environment since foster placement. He admitted that both children had been with their mother for a substantial part of the time period between these two evaluations. Dr. Bassman further noted that his direct discussions with the two children themselves showed that they were now "much more spontaneous" and spoke very positively about their relationships with their new foster family. They were described as very warm and loving children who have adapted quickly to placement and "will react to a lot of love."

Dr. Steven Stern, another clinical psychologist, also testified as to the results of his evaluations of the children M. and E. on February 18, 1981. He evaluated M. as being of average intelligence with "a lot of anxiety." The evaluations by Dr. Stern were only one week after the children were placed in foster care and he felt that that was not a long enough period to adapt to their new placement. However, he felt that it was not in the best interest of these children to be returned to their mother at this time as they needed a "stable, protecting and nurturing

environment" at this point. He felt that their emotional and learning problems "could be corrected."

Linda Weinberg, M.D., a board-certified pediatrician, testified as to her evaluations. Dr. Weinberg was in charge of the multi-discipline team of professionals that evaluated the children at the Child Development Center of Our Lady of Lourdes Hospital. She noted various developmental disabilities suffered by all three. Plans were developed by the Center to treat these problems. Thereafter, these plans were discussed fully with C. M., who was "somewhat agitated" and questioned whether the staff was qualified to make their diagnosis. As to C. M. herself, Dr. Weinberg noted, "I was concerned about Mrs. M.'s mental condition." Based upon her training and observations of C. M. she was of the opinion that she "would have serious doubts to whether C. M. could carry out their plans" for the children. She testified as to one instance where the children were unkempt and disheveled with "quite dirty" hands. C. M. explained that she didn't want them to wash their hands because they might get colds. As to the youngest child, D. age one, Dr. Weinberg noted serious developmental delays together with difficulties in establishing a normal feeding pattern. She said that the baby was rather rigid, and her weight was in the third percentile of normal for children of that age. She also noted that her information indicated that the baby had not begun cooing until she was in foster placement. Dr. Weinberg was concerned that their treatment plans for all three children needed the close supervision of a "daily structured program."

Maria E. Doria, M.D., a board-certified psychiatrist, testified to the results of her court-ordered independent psychiatric evaluation of defendant. Dr. Doria stated that C. M. suffered from "Subchronic Paranoid Schizophrenia." It was her opinion that C. M.'s judgment was impaired and that she was very preoccupied. She noted that she tended to form an idea about her children and react from that basis as to all parts of her relationship with the child. As to the oldest child, M., she felt C. M. was very attached to her but treated the child like a teddy-bear from whom she had difficulty separating. This relationship tended to

"exclude the other children." While she had "grandiose" ideas regarding M., she would have the other children "left to be by themselves." Under this relationship Dr. Doria felt that even the one child that she was close to would "have developmental delays and might have inability to function properly in school." It was the doctor's opinion that if this continued the child would become mentally retarded as a "socio-economic retardation."

It was Dr. Doria's professional opinion that C. M. "cannot deal effectively with a child who needs special help." She recommended that C. M. be involved in a daily hospital treatment program, including medication. She noted that C. M. was opposed to this recommendation. As to the children, she felt that their developmental disabilities could be treated by providing "maximum stimulation." It was her opinion that the children were endangered and neglected. During C. M.'s periods of preoccupation "she might not feed, clothe or wash" them. Dr. Doria also felt that C. M. would have "inappropriate responses" to their needs based upon "her poor reality testing." Her prognosis was "poor to guarded, because of the chronicity" of the mental illness. Dr. Doria concluded with her opinion that treatment was necessary to help C. M. She had been in court during testimony of defendant, whose appearance and behavior in court the doctor described as "indicative of her illness as diagnosed."

C. M. testified in her own behalf. Her testimony was rambling and very disjointed. She claimed that a lot of false statements had been made throughout the trial. Many of her responses to direct questions were given in extensive statements not always connected to the focus of the inquiry. She obviously cared for her children and noted her efforts in trying to get treatment for their problems. She claimed that she would cooperate with any plan developed by the court or the doctors working with her children.

The exhibits admitted into evidence included a number of reports of evaluations of defendant and the children, together

with hospital records and DYFS reports. This information confirms the testimony given by each of the witnesses. It is somewhat cumulative but shows in greater depth the specific problems presented.

The court is urged by the State to find that the children are abused or neglected on the basis of mental and emotional deprivation because of their mother's inability to effectively parent them due to mental illness. The defense contends that in the absence of physical abuse or proof of malnourishment there is insufficient grounds for the court to determine that the children are not receiving at least a minimum degree of care.

*N.J.S.A.* 9:6–8.21 c provides:

> "Abused or neglected child" means a child less than 18 years of age whose parent or guardian ... creates a substantial risk of ... protracted impairment of physical or emotional health ... or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court; ....

From the evidence presented certain factual determinations are apparent to the court by more than a preponderance of the believable evidence and beyond all reasonable doubt.

C. M. is suffering from a chronic mental illness in the form of schizophrenia, paranoid type. She has refused all psychiatric treatment or professional efforts to control her illness, which is manifested by irrational behavior and lack of good judgment in dealing with everyday realities. She has little or no understanding of the responsibilities of parenting children, other than feeding and clothing them. Her paranoia interferes with her ability to follow any treatment plan for herself or her children as developed by any outside authority.

The children, M., E., and D., are mentally and emotionally deprived by reason of the actions or inactions of their mother. At the time of their removal both M. and E. were suffering

from speech and learning disabilities, together with a retardation of their normal intelligence by reason of lack of stimulation by their mother. Baby D. is seriously developmentally delayed by reason of the lack of nurturing and attention from her mother. All three children have significant delays in their motor skills. These disabilities are correctable with proper care, including increased socialization and attention to specific treatment plans which have been developed for each child. C. M. appears unwilling or unable to supervise her children through the treatment plans on a continuous basis.

Substandard housing conditions were maintained by C. M. for herself and her children. For no apparent reason the premises were dirty, cluttered and roach-infested, with spoiled food scattered throughout. This was not due to C. M.'s poverty since she did clean up the premises shortly before and after the children's removal.

The applicability of the statutory provisions of the factual determinations requires careful interpretation in any case where children have been moved from a natural parent. The case of *Doe v. G. D.*, 146 *N.J.Super.* 419 (App.Div.1976), aff'd *sub nom. Doe v. Downey*, 74 *N.J.* 196 (1977), involved similar circumstances with allegations of substandard and dirty housing conditions and failure to educate or provide intellectual stimulation. The appellate court reversed the trial court's finding of abuse or neglect in applying the facts of that case, noting:

> Wholly apart from the judge's articulation of his understanding of the statutory standard, it is clear from an examination of his findings and the emphasis in his opinion that he misconceived the nature and basis for the proceeding. First, he emphasized the unacceptability of substandard, dirty and inadequate sleeping conditions. While they may be unfortunate incidents of poverty, they do not establish child neglect or abuse. Adoption of such facts as a basis for a finding of child neglect or abuse might result in mass transfers of children from ghettos and disadvantaged areas into more luxurious living accommodations but with resultant destruction of the natural parental bond.... Equally inappropriate was the trial court's conclusion that N. was neglected or abused because of G.'s failure to educate or provide her with intellectual stimulation. [146 *N.J.Super.* at 431]

The *Doe* case involved an infant who had been voluntarily placed in foster care by her young mother, who visited with the

child during the period of her foster placement. The mother then revoked her voluntary foster placement and regained custody of the child for a period of eight months and until the court hearing. That trial court determined that her living accommodations were "unacceptable by reasonable standards" and that she was unable to provide for the child's minimal needs as to "education" as contained in the statute N.J.S.A. 9:6–8.-21(c)(4)(a).

The Doe case was affirmed by the Supreme Court unanimously. It agreed with the Appellate Division's limitation of the definition of "education." In rejecting the broadening of the definition of "education" to include "significant and long-lasting deficiencies in a child's language, intelligence, motor and emotional development . . . attributable to marked deprivation of . . . ordinary interaction between parent and child," that court noted:

> . . . Such abuses of children . . . are *amply remediable under that separate provision of the definition section which comprehends as abuse or neglect the absence of minimum care to provide the child "with proper supervision or guardianship, by reasonably inflicting or allowing to be inflicted harm, or substantial risk thereof including . . . excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court."* N.J.S.A. 9:6–8.21 c. (4)(b). [Emphasis supplied.]

The opinion in Doe v. G. D., supra, is distinguishable in two significant areas. First, the children of C. M. have been constantly in her care since birth. Their mental and emotional disabilities are directly related to the care and supervision that they received from their mother. This is not a case of a child being shuttled back and forth and suffering from the traumatic effects of those separations present in the Doe case. The "developmental delays" suffered by M., E., and D. are a result of an environment controlled solely by their mother and the lack of nurturing and care provided by her as their sole parent. The second important distinction is the serious mental illness which incapacitates C. M. Her inability or unwillingness to accept psychiatric treatment, including medication, or the services offered by the various social service agencies, deprives the children of any chance of positive change in their environmental situa-

tion. There was nothing in *Doe v. G. D.* to indicate any evidence of mental illness on the part of the natural mother.

The statute, *N.J.S.A.* 9:6–8–21c, provides both general and specific standards. In determining whether the actions of the parent "creates [a] substantial risk of ... protracted impairment of physical or emotional health" the court must consider the full picture or the totality of the circumstances. The showing must be "substantial." By use of the terms "imminent danger" and "failure ... to exercise a minimum degree of care" our Legislature has established a high standard of proof before permitting "state intrusion into the personal relationship between parent and child." *Doe, supra* 146 *N.J.Super.* at 431.

■ In evaluating the whole picture each part cannot be separately determined. In child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the children. One act may be "substantial" or the sum of many acts may be "substantial."

■ The singular acts of neglect include removing M. from her much needed special education class because C. M. became angry at the school nurse; failure to interact with E. and D. or pick up and fondle the baby; the dirt and unsanitary conditions the children were compelled to live in, and the many more incidents caused by C. M.'s instability. Individually each act may not be sufficient for court intervention; collectively, the picture is one of substantial neglect and endangerment of the children's mental and emotional health.

The effect of neglect upon children is also dependent upon the parent's ability or willingness to change. *DYFS v. Huggins*, 148 *N.J.Super.* 86, 93 (J. & D.R.C.1977); *DYFS v. B. W.*, 157 *N.J.Super.* 301 (J. & D.R.C.1977).

It has been held in another jurisdiction that evidence of chronic schizophrenia was sufficient to provide a basis to show substantial probability of neglect and justify removal. *In re Eugene G.*, 76 *A.D.2d* 781, 429 *N.Y.S.2d* 17 (App.Div.1980); *Social Services Dep't v. Joan R.*, 61 *A.D.2d* 1108, 403 *N.Y.S.2d*

368 (App.Div.1978); *In re Millar*, 40 *A.D.2d* 637, 336 *N.Y.S.2d* 144 (App.Div.1972). All three of these New York cases involve mothers with mental illnesses diagnosed similar to that of C. M. The *Millar* case also involved the interpretation of a statute which was worded the same as our New Jersey statute (*N.J.S.A.* 9:6–8.21(c)).

■ Having determined a direct causal relationship between the acts of neglect of C. M. and their substantial effect upon her children, this court is compelled to determine that the children, M., E., and D., have been abused and neglected by their parent C. M., creating a substantial risk of the protracted impairment of their emotional health. Their mental and emotional condition has been impaired and is in imminent danger of becoming further impaired by reason of the failure of C. M. to exercise a minimum degree of care in providing the children with proper supervision. They are placed under the protective custody, care and supervision of DYFS until the dispositional hearing.