RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4907-14T1
 A-4908-14T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

C.Z. AND E.Z.,

 Defendants-Appellants.

IN THE MATTER OF
A.Z., J.Z., and C.Z.,

 Minors.
___________________________________

 Argued June 1, 2017 – Decided June 21, 2017

 Before Judges Fuentes, Carroll and Farrington.

 On appeal from the Superior Court of New
 Jersey, Chancery Division, Family Part, Warren
 County, Docket No. FN-21-142-14.

 Clara S. Licata, Designated Counsel, argued
 the cause for appellant C.Z. (Joseph E.
 Krakora, Public Defender, attorney; Ms.
 Licata, on the briefs).
 Beth Anne Hahn, Designated Counsel, argued the
 cause for appellant E.Z. (Joseph E. Krakora,
 Public Defender, attorney; Ms. Hahn, on the
 briefs).

 Sara M. Gregory, Deputy Attorney General,
 argued the cause for respondent (Christopher
 S. Porrino, Attorney General, attorney; Andrea
 M. Silkowitz, Assistant Attorney General, of
 counsel; Ms. Gregory, on the brief).

 Lisa M. Black, Designated Counsel, argued the
 cause for minors (Joseph E. Krakora, Public
 Defender, Law Guardian, attorney; Ms. Black,
 on the brief).

PER CURIAM

 Defendant E.Z. (Erica)1 is the biological mother and defendant

C.Z. (Conor) is the biological father of three minor children:

A.Z. (Alice), born in June 2006; C.Z. (Christopher), born in March

2009; and J.Z. (James), born in August 2010. In these consolidated

appeals, defendants challenge the April 30, 2014 Family Part order

finding that they abused or neglected the children pursuant to

N.J.S.A. 9:6-8.21(c)(4)(a).

 In New Jersey Division of Child Protection and Permanency v.

L.W., 435 N.J. Super. 189 (App. Div. 2014), we held that

homelessness resulting from a parent's poor planning did not

support a finding of abuse and neglect under N.J.S.A.

1
 We use pseudonyms for the reader's convenience and to protect
the privacy of the children.

 2 A-4907-14T1
9:6-8.21(c)(4)(a). Because we find L.W. squarely controlling, we

reverse.

 I.

 The family first came to the attention of the New Jersey

Division of Child Protection and Permanency (the Division) in June

2011, when the Division received referrals expressing concerns

about defendants' supervision of Alice and Christopher. Upon

visiting defendants' residence in Phillipsburg to investigate,

defendants informed the Division of their difficult financial

situation. Specifically, defendants stated they received $716 per

month in food stamps, $433 in aid from the Temporary Assistance

for Needy Families ("TANF") program, $1080 from the Section 8

Housing Assistance program (which completely covered their rent),

and that the children had medical insurance coverage. The Division

determined the allegation of abuse or neglect was unfounded.

 The Division received another referral in July 2011,

reporting that defendants negligently failed to supervise their

children. The referral was investigated and determined to be

unfounded.

 The Division received additional referrals on April 29, 2012,

and May 3, 2012, alleging that defendants engaged in inappropriate

conduct that put the family at risk of eviction, and were verbally

abusing the children. When the Division visited the family, Conor

 3 A-4907-14T1
admitted "his children's medical insurance had lapsed[,]" even

though both Alice and Christopher needed to see specialists for

their disorders of sex development (DSDs).2 Erica confirmed the

lapse, but indicated she was "in the process" of re-activating the

coverage. Conor further conceded the family was at risk of losing

their electricity because their utility bill was delinquent, but

he hoped to satisfy the required balance when Erica was paid at

the end of the week. The Division also learned that Alice would

be repeating kindergarten because she missed seventy-four days of

school. The allegations of abuse or neglect were unfounded, but

the Division remained involved with the family to monitor the

children's medical appointments.

 The Division received another referral in October 2012,

reporting the family had moved to a different residence in

Phillipsburg, but had lost power five days earlier due to Hurricane

Sandy and an unpaid balance on their gas utility bill. The

Division ultimately paid the bill after Conor's attempts to contact

2
 The record and briefs refer to the disorder as hermaphroditism,
but "experts, patients and families" no longer use that term;
"[i]ncreasingly, this group of conditions is being called
disorders of sex development (DSDs)." Nat'l Inst. of Health, U.S.
Nat'l Library of Med., Intersex, MedlinePlus,
https://medlineplus.gov/ency/article/001669.htm (last updated
June 5, 2017).

 4 A-4907-14T1
various social service agencies for assistance proved

unsuccessful.

 The Division then held a budget meeting with defendants and

learned they: (1) received $657 in food stamps, (2) earned $800

monthly income, and (3) received a monthly $40 voucher from the

Universal Service Fund ("USF") to pay the gas bill. Erica also

informed the Division that the children had seen their primary

care physician, but she had not yet scheduled follow-up

appointments with the children's urologists or endocrinologists.

The Division concluded that its investigation "revealed no

concerns of abuse or neglect."

 On June 2, 2013, the Phillipsburg Police Department received

an anonymous phone call alleging that Conor was yelling at the

children and had smacked James on the back of the head with an

open hand. A police officer went to the home but observed "no

signs of abuse or neglect." The officer "reported that there were

no concerns but he had to call it into the Division because of the

allegations. He reported that there were no marks or bruises on

the children and they looked happy."

 Two days later, a Division caseworker "spent the morning with

the family creating a budget and calling local and government

agencies to get funding for the family." The Division was informed

that the electricity had been turned off on May 21, 2013.

 5 A-4907-14T1
Defendants reported that Erica earned $460 per month working at

Walmart, and they received $600 per month in food stamps.

Defendants further reported that they fell behind because of a

lack of day care. Consequently, because Erica was the higher wage

earner, Conor quit his job at McDonalds to care for the children.

Notably, the caseworker "informed the family that they might need

to move [due] to the high electric and gas fees that they reported

were not told to them prior to moving in to the home."

 The caseworker went to the children's school and observed

they appeared happy and dressed appropriately. At that time,

Alice was in kindergarten and Christopher was in the three-year-

old class. A school counselor reported that the children's

attendance had been "a major issue" because Alice had forty-eight

unexcused absences and Christopher had forty-one. The counselor

described both children as "polite and nice," and stated they were

performing acceptably in school and their attendance issues would

not prevent them from advancing to the next grade level. The

counselor "also reported that she has met with [Erica] and they

are supposed to meet in the beginning of the school year 2013-2014

to try and rectify any issues." When questioned by the caseworker

about the school absences, Erica responded that "there were missed

days because the children needed to go to the doctor which they

gave the school notes for and [] they only have one car and she

 6 A-4907-14T1
would come home late from working overnights." Erica further

advised "that she and her husband are working to correct the

absences for next year."

 Finally, the caseworker reported that James "was dressed

appropriately and seemed to be in good spirits. His weight and

hygiene looked good." The caseworker's assessment of the home was

that it "was clean and neat" and "free of safety hazards."

Additionally, "[t]he parents appeared to be engaged with the

children and care for them in a well manner. The parents appeared

to show appropriate affection to each other and the children. The

worker has no concerns at this time."

 The present controversy commenced on December 11, 2013, when

Conor contacted the Division to report that the family would be

homeless by the end of the week. Conor indicated that the family

had been living in Allentown, Pennsylvania, but they were evicted

on November 25, 2013; that they unsuccessfully sought help from

the Lehigh County Welfare agency and the Salvation Army; that

Alice had not been in school for about three weeks; and that they

were temporarily residing with Erica's sister, Christine.

 Upon arriving at Christine's home, the Division caseworker

observed it "was clean and free of any safety concerns" and "[a]ll

of the children appeared well cared for and were free of any

visible signs of injury." Conor explained that both he and Erica

 7 A-4907-14T1
had applied for, and obtained, jobs with Amazon. However, Connor's

employment with Amazon was rescinded due to his criminal conviction

for a weapons offense in 2004. As a result, defendants could no

longer afford the Allentown apartment where they had moved to be

closer to their employment with Amazon. Erica further advised

that they could not receive public housing assistance because they

owed around $200 in unpaid rent, which they believed was "not

worth repaying" since they would then be placed on a waiting list

that could take months, and they needed housing immediately.

 One week later, the Division met with the family to provide

the children with clothing and toys for Christmas. Defendants

indicated they changed their address to Christine's residence in

Phillipsburg to receive financial assistance and food stamps and

re-establish residency in New Jersey. However, on December 27,

2013, and January 4, 2014, Conor left two telephone messages with

the Division stating defendants had failed to secure housing and

were denied food stamps because of a $600 overpayment they received

when they moved to Allentown. On January 6, 2014, the Division

received a Related Information (RI) referral from Conor's mother

reporting the family was facing homelessness and expressing

concerns about defendants' mismanagement of money and expenses.

 The next day, the Division caseworker contacted Conor, who

confirmed that the family could not stay with Christine any longer

 8 A-4907-14T1
and had traveled to Jersey City where they unsuccessfully sought

to enter a shelter. Conor also informed the caseworker that

defendants had obtained the paperwork to enroll Alice in school

but had not yet returned it. After futilely attempting to secure

housing, the Division paid for the family to stay a night at a

hotel. The caseworker met with the family at the hotel, and noted

"[t]he children all appeared to be in good spirits and did not

show any signs of visible injury." While there, Conor explained

to the caseworker that "he and Erica did not want to live off the

system anymore" and "tried to make it on their own." This decision

prompted them to leave their Section 8 housing in Phillipsburg and

move to Allentown to commence employment at Amazon.

 On January 8, 2014, the caseworker contacted the Section 8

Housing program in Phillipsburg to determine the family's status,

only to learn they were ineligible because defendants failed to

follow up with the necessary documentation in August 2013, and did

not challenge this determination by the appeal deadline. These

failures rendered them ineligible to receive benefits for three

years. After receiving this information, the Division executed

an emergency removal of the children due to defendants' inability

to provide basic needs such as food and shelter for them. At that

time, it was learned that the boys were behind on their

immunizations. Alice was given a flu shot, the children were all

 9 A-4907-14T1
updated on their immunizations, and then brought to Division-

approved foster homes.

 On January 10, 2014, the Division filed a complaint alleging

the children were abused or neglected by defendants and seeking

custody of the children. On that same date, the court continued

custody of the children with the Division; appointed a law

guardian; and directed the Division to continue to provide

assistance in locating a shelter for the family. On January 29,

2014, the court ordered legal and physical custody of the children

to remain with the Division, and granted defendants two hours of

unsupervised visitation with the children each week.

 The court conducted a fact-finding hearing on April 29 and

30, 2014. Division caseworker Emil Ahmed testified about the

Division's history with the family as discussed above, and the

Division introduced relevant documents, including the eviction and

Section 8 letters.

 Erica testified on her own behalf that while the family was

living in Phillipsburg she earned $9.20 per hour working about

twenty-five hours per week at Walmart. Prior to that, she worked

approximately the same number of hours at Burger King, where she

earned $7.25 per hour. During this period, they paid $114 per

month in rent, with the balance subsidized by Section 8 housing

assistance. Before receiving Section 8 benefits, defendants had

 10 A-4907-14T1
lived in the projects in Phillipsburg. Also, the family has

received food stamps since the children were born. Erica testified

that, even when defendants were receiving these welfare benefits,

they still had difficulty paying the family's bills.

 According to Erica, she and Conor decided to move the family

to Allentown because they secured full-time jobs at Amazon's

Breinigsville, Pennsylvania warehouse facility, which initially

paid $10 per hour and then increased to $11.50 per hour. She

explained that they "wanted to be off the system," by which she

meant, "[w]e didn't want to have [] food stamps or anything. We

wanted to do it ourself." As a result, defendants opted not to

pursue the continuation of their Section 8 benefits.

 The job with Amazon began at the end of August 2013, and

Erica continued working there until she was laid off on December

9, 2013. Erica testified that Conor worked there two weeks before

being laid off because of his criminal background. Consequently,

defendants were no longer able to afford the $675 per month rent

plus utilities at the new Allentown apartment. On November 25,

2013, they returned to Phillipsburg, and initially stayed with

Erica's sister Christine while they searched for new housing. They

attempted to again get food stamps, but were told they were

ineligible until they were back in New Jersey for six months. They

also tried to enroll Alice in school, but were unsuccessful because

 11 A-4907-14T1
the school required proof of residency, such as utility bills,

which they could not provide.

 Erica described the children's disorders of sex development,

for which Alice had undergone multiple surgeries, Christopher

minor surgery, and James faced future surgery. All three children

were missing chromosome 15, which affected their immune system and

led them to "get sick a lot." This also resulted in Alice's

frequent absences from school. Erica conceded, however, she often

did not get home from work until 2:00 a.m. and "was really tired

and didn't get up in the morning," nor did Conor, who stayed up

all night with James when he was a baby.

 In an oral decision immediately following counsel's

summations, the judge stated "the main issue in this case is . . .

the family's homelessness." She found "[t]here was no evidence

. . . or [] testimony presented as to why [] defendants could not

comply with the requirements of the Section 8 Housing [Authority]"

in July 2013, prior to their move to Allentown. The judge noted

that defendants received a $600 overpayment in food stamps before

they moved, and did not find credible Erica's testimony that she

believed she was entitled to receive it. The judge determined

that by November 2013, defendants fell behind on their Allentown

rental payments "despite the considerable amount of income that

was coming into the home, plus a month's worth, in September, of

 12 A-4907-14T1
food stamps." The judge also criticized defendants for using a

$7000 income tax refund they received in 2013 to purchase a car

for $2000, to buy clothing and furnishings for the children, and

to set aside $1000 of it to pay Conor's $40 biweekly child support

obligation.

 Ultimately, the judge found "the facts in [L.W.] are

completely distinguishable from the facts in this case." The

judge elaborated:

 So, it was beyond poor planning. It was
 [] defendants' deliberate and purposeful
 noncompliance with Section 8 Housing, as well
 as their receipt of food stamps . . . for a
 time period when they were not to receive it
 that then precluded them from getting the
 assistance that they then did need, for
 whatever reason, in January [] 2014. And why
 they were precluded from availing themselves
 [of] many services that normally would have
 been made available to them.

 So, the [c]ourt does find that their
 actions do rise to the level of gross neglect.
 That this is beyond poor planning in which
 this family found themselves homeless [] in
 December [] 2013 and January [] [2014]. That
 they did have the financial capability,
 certainly in November [] 2013, to pay for the
 housing that they had at that point in time,
 in view of the income that came into the home,
 and in view of the tax refund that was
 receiv[ed], in view of their ability to plan
 as indicated by taking $1000 aside and not
 even making a lump sum payment on the child
 support, but making the biweekly payments.

 And that it does rise to the level of
 willful and wanton neglect. And that, in

 13 A-4907-14T1
 accordance with . . . [N.J.S.A.] 9:6-
 8.21(c)(4), that these children were in
 imminent danger; that their physical, mental,
 or emotional condition was in imminent danger
 of becoming impaired as a result of the
 failure of their parents to exercise a minimum
 degree of care in supplying the children with
 adequate shelter, although financially able to
 do so or though offered financial or other
 reasonable means to do so.

 Again, they were financially capable to
 do so for a period of time. And the reason
 why the offered financial assist[ance] or
 other social service assistance was not
 available to them was because of their
 simpl[e] noncompliance with those programs
 from the past.

 In addition, I find that they also failed
 to provide the appropriate education[],
 specifically with regard to [Alice], with the
 understanding that the history of her absences
 and tardies and the fact that she had to repeat
 a grade, even though she advanced to first
 grade. That she was no longer in the
 Pennsylvania school system [] as of at least
 November 25, if not earlier, and that an
 appointment wasn't even made for her to be
 enrolled in the New Jersey school system until
 December 19, almost [] a month thereafter.

 On May 21, 2015, the trial court entered an order terminating

the child protection services litigation. This appeal followed.

 II.

 On appeal from the court's fact-finding order, Erica argues

that the Division failed to prove she neglected her children by a

preponderance of the evidence. In a similar vein, Conor contends

that there was insufficient evidence to support the finding that

 14 A-4907-14T1
he was reckless or grossly negligent in failing to provide the

children with adequate shelter, medical care, or education, and

that the children were not at substantial risk of harm or facing

imminent danger.

 We begin with a review of the applicable legal principles

that guide our analysis. We defer to the trial court's factual

determinations "unless 'they are so wholly insupportable as to

result in a denial of justice,'" and so long as "they are

'supported by adequate, substantial and credible evidence.'" In

re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)

(quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65

N.J. 474, 483-84 (1974)). The trial court is best suited to assess

credibility, weigh testimony, and develop a feel for the case.

N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342

(2010). Special deference is accorded to the Family Part's

expertise. Id. at 343; Cesare v. Cesare, 154 N.J. 394, 413 (1998).

However, "'[a] trial court's interpretation of the law and the

legal consequences that flow from established facts are not

entitled to any special deference.'" N.J. Div. of Youth & Family

Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006) (quoting

Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378

(1995)), certif. denied, 190 N.J. 257 (2007).

 An abused or neglected child is defined as:

 15 A-4907-14T1
 [A] child whose physical, mental, or emotional
 condition has been impaired or is in imminent
 danger of becoming impaired as the result of
 the failure of his parent . . . to exercise a
 minimum degree of care (a) in supplying the
 child with adequate food, clothing, shelter,
 education, medical or surgical care though
 financially able to do so or though offered
 financial or other reasonable means to do
 so[.]

 [N.J.S.A. 9:6-8.21(c)(4).]

 Here, the finding of abuse and neglect centers on defendants'

purported "failure . . . to exercise a minimum degree of care,"

in supplying the children with adequate shelter and education.

Our Supreme Court has held that:

 The phrase "minimum degree of care" denotes a
 lesser burden on the actor than a duty of
 ordinary care. If a lesser measure of care
 is required of an actor, then something more
 than ordinary negligence is required to hold
 the actor liable. The most logical higher
 measure of neglect is found in conduct that
 is grossly negligent because it is willful or
 wanton. Therefore, we believe the phrase
 "minimum degree of care" refers to conduct
 that is grossly or wantonly negligent, but not
 necessarily intentional.

 [N.J. Div. of Youth & Family Servs. v. T.B.,
 207 N.J. 294, 305 (2011) (quoting G.S. v.
 Dep't of Human Servs., 157 N.J. 161, 177-78
 (1999)).]

 In turn, "'willful and wanton misconduct implies that a person

has acted with reckless disregard for the safety of others. Where

an ordinary reasonable person would understand that a situation

 16 A-4907-14T1
poses dangerous risks and acts without regard for the potentially

serious consequences, the law holds him responsible for the

injuries he causes.'" Id. at 306 (citations omitted) (quoting

G.S., supra, 157 N.J. at 179). "[W]here a parent or guardian acts

in a grossly negligent or reckless manner, that deviation from the

standard of care may support an inference that the child is subject

to future danger. To the contrary, where a parent is merely

negligent there is no warrant to infer that the child will be at

future risk." Id. at 307.

 In L.W., supra, 435 N.J. Super. at 191, we reversed a trial

court's finding that L.W. neglected her two young children by

failing to provide housing. In that case, as here, L.W. had been

the subject of several prior referrals to the Division. Id. at

191-93. The proofs at the fact-finding hearing established that

L.W. had moved to Georgia with her fiancé, but then returned to

New Jersey. L.W. testified that she moved to a shelter and then

took the children to live with her fiancé in his transitional

housing in a Newark hotel. She also unsuccessfully sought

employment and welfare benefits. After exploring all options, and

unable to locate housing, she contacted the Division to seek help

for the children so they would not be living "out on the street."

Id. at 192-93. The Division caseworker noted that the children

were clean, well-fed, and well-clothed. Id. at 192.

 17 A-4907-14T1
 The trial court "found that [L.W.] did not have housing for

her children due to her 'unbelievably poor planning.'" Id. at

193. The judge also "criticized L.W. for following her fiancé in

spite of the effect on her children," and also found her "to be

irresponsible for leaving permanent housing in Georgia to come to

New Jersey without the means to return." Ibid.

 In reversing, we noted "[i]t is well-settled that poverty

alone is not a basis for a finding of abuse or neglect." Id. at

195 (citing Doe v. G.D., 146 N.J. Super. 419, 430-31 (App. Div.

1976), aff’d sub nom., 74 N.J. 196 (1977). We concluded:

 [L.W.'s] poor planning is at least in
 part a side-effect of poverty. She sought
 housing through government agencies. She
 sought employment to no avail. Like many
 people, she formed a bond with her fiancé and
 tied her family welfare to his ability to
 provide housing. Ultimately, he was unable
 to provide housing for the children, so [L.W.]
 did what was in their best interest by coming
 to the Division for help instead of subjecting
 her children to further homelessness. We
 agree with the first judge who reviewed this
 matter that by seeking help from the Division,
 [L.W.] "did the responsible thing." The
 Division, as a child welfare agency, has a
 primary mission to help families stay together
 and to assist parents to raise safe and
 healthy children. See N.J.S.A. 30:4C-11.3
 (citing a general policy to reunify families
 absent imminent threat to a child's safety).

 Although there was insufficient evidence
 to sustain a finding of neglect under Title
 Nine, the Division may still provide services
 to [L.W.] and her family with her consent

 18 A-4907-14T1
 pursuant to N.J.S.A. 30:4C-11, or may seek a
 court order to provide services in the best
 interest of the children pursuant to N.J.S.A.
 30:4C-12. See N.J. Div. of Youth & Family
 Servs. v. I.S., 214 N.J. 8, 15 (2013) (stating
 that the Legislature intended N.J.S.A. 30:4C-
 12 to authorize the court to "award care,
 supervision, and even custody" to the Division
 "when children need services and a parent
 cannot provide that help for no fault–based
 reason"), cert. denied, ___ U.S. ___, 134 S.
 Ct. 529, 187 L. Ed. 2d 380 (2013).

 It is important that impoverished,
 homeless parents feel free to call on the
 Division in times of need, without fear of
 being found neglectful for "poor planning."
 . . . For the many people who live on or over
 the edge of homelessness in New Jersey, the
 Division may be their last resort; it provides
 a way to find safe housing for their young
 children, even at the cost of the parent's
 temporary separation from those children.
 Such a parental sacrifice to promote the
 welfare of their children should be
 encouraged.

 [Id. at 196-97.]

 The parallels between L.W. and the present case are striking,

and the principles we espoused there are no less applicable here.

In the present case, the Division received several referrals

regarding the family, and each allegation of abuse and neglect was

investigated and determined to be unfounded. It is undisputed

that at all times the family lived on the brink of poverty.

Defendants first lived in the projects in Phillipsburg before

moving upon securing Section 8 housing. While residing in

 19 A-4907-14T1
Phillipsburg, Erica was only able to obtain low-paying, part-time

jobs at Burger King and Walmart. Similarly, Conor worked for a

time at McDonald's, but his criminal conviction prevented him from

obtaining more gainful employment. Like many low-income families,

defendants found the cost of daycare prohibitive, and Conor assumed

the role of caretaker for the three young children while Erica

worked.

 The evidence is undisputed that at the time defendants moved

to Allentown to commence working full-time jobs with Amazon, they

had been in Section 8 housing in Phillipsburg for four years and

had been receiving food stamps and TANF benefits since Alice was

born. Indeed, the Law Guardian's brief "acknowledges that this

family lived below the poverty line for many years – they were

receiving food stamps, rental assistance and vouchers to help pay

the utilities since their oldest child was born." Seeing no end

to this vicious cycle of subsistence living, defendants chose to

terminate their affiliation with Section 8 and cease their reliance

on food stamps and other forms of public assistance and "tried to

make it on their own." We are loathe to characterize this decision

as anything other than laudable. The full-time jobs both

defendants searched for and obtained with Amazon provided them

with earnings that far surpassed those they had in Phillipsburg.

Certainly, defendants' decision to take these higher-paying jobs

 20 A-4907-14T1
was a reasonable step in attempting to break away from the cycle

of dependence that previously ensnared them.

 Unfortunately, in retrospect, defendants' decision to

terminate their reliance on public assistance proved detrimental

after Conor's employment with Amazon was quickly rescinded and

Erica was laid off in early December, 2013, apparently through no

fault of her own. However, hindsight's twenty-twenty vision should

not serve to distort a parent's reasonable judgment at the time.

The record simply does not show that defendants acted with gross

or wanton negligence, knowing that injury was likely, or recklessly

disregarding that possibility. G.S., supra, 157 N.J. at 178.

 Moreover, the record does not contain any evidence of a time

or instance when the children were at a substantial risk of harm.

As in L.W., here the Division caseworker invariably observed that

the children were well-cared for, clean, and properly nourished.

Nor were there any findings of drug or alcohol abuse or domestic

violence on the part of the parents that exposed any of these

children to imminent danger or a substantial risk of harm. Absent

proof that defendants' actions placed the children in imminent

danger of being impaired physically, mentally, or emotionally,

N.J.S.A. 9:6-8.21(c), we are constrained to conclude the court's

finding cannot be sustained, even accepting the Family Part's

 21 A-4907-14T1
findings of fact and credibility determinations, because the

record only demonstrated some potential for harm.

 As in L.W., defendants acted responsibly in contacting the

Division in December 2013, when the family was at risk of becoming

homeless. As we noted in L.W., a finding that a parent has not

abused or neglected a child, which requires a dismissal of the

Title Nine action, N.J.S.A. 9:6-8.50(c), does not prevent the

Division from protecting a child in need of services to ensure his

or her safety and welfare. L.W., supra, 435 N.J. Super. at 196;

see also N.J. Dep't of Children & Families v. A.L., 213 N.J. 1,

30-34 (2013). Here, while we agree that the Division's initial

actions were proper, it should have proceeded under Title 30 in

its efforts to protect the children and provide services to the

parents.

 We agree with the trial court that Alice's frequent absences

from school present a cause for concern. However, Alice's absences

during her initial year of kindergarten largely came when she was

under six years of age and thus not subject to compulsory education

requirements. N.J.S.A. 18A:38-25. While certainly the following

year there were several unexcused absences, Alice's absence

between November 25, 2013 and December 19, 2013, coincided with

the period when defendants were attempting to establish proof of

residency, which they were informed by school officials was a

 22 A-4907-14T1
prerequisite for Alice's enrollment. Indeed, in its brief the

Division concedes that "the issues of educational and medical

neglect, standing alone, may not support a finding of neglect."

In any event, the record confirms that defendants are now well

aware of their obligation to ensure the children's educational

needs are met, and the consequences that may well befall them

should they fail to honor that obligation.

 In sum, the absence of substantial evidence of abuse or

neglect requires us to vacate the April 30, 2014 fact-finding

order. Additionally, we direct the Division to remove defendants'

names from the Central Registry maintain pursuant to N.J.S.A.

9:6-8.11, in relation to the events that were the subject of that

order.

 Reversed.

 23 A-4907-14T1