NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF, v. B. W., DEFENDANT.

Juvenile and Domestic Relations Court
Camden County

September 30, 1977.

*Mr. William Mild, III,* Deputy Attorney General, for plaintiff (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

*Mr. Norman Rosenblum,* for defendant (*Mr. Stanley Van Ness,* Public Advocate, attorney).

*Mr. Peter W. Reilly,* law guardian for K. and R.

PAGE, P. J. J. D. R. C. This is an action for the termination of the parental rights in the two surviving children of the biological parent, defendant B.W. Her other two children died as the result of a fire which occurred during her absence from the family residence.

It is argued that the mother's borderline retardation, coupled with her level of parenting prior to the fire, mandate the permanent termination of her parental rights. This court must now determine the future of K., age 5, and R., age 3, based upon their "best interests" at this juncture.

Subsequent to the fire the Division of Youth and Family Services (Division) on January 9, 1976 filed a child neglect complaint, pursuant to *N. J. S. A.* 9:6–8.21 *et seq.*

On February 18, 1977 this action was expanded to include a petition for the termination of parental rights under *N. J. S. A.* 30:4C–15, upon the motion of the law guardian of K. and R. The Division initially opposed this petition, but on May 20, 1977 it formally joined therein.

A criminal complaint was also filed against B.W. On November 5, 1976 she pled guilty to three counts of child neglect. She was subsequently sentenced to three years of probation.

Sometime during the late afternoon of January 1, 1976 B.W. went to see a movie in Philadelphia with her two year old son R. and her boyfriend P. Her other three children, B., age 5, Bob, age 1 and K., age 4 were left at home alone, "under B's supervision." Prior to their return a fire broke out in the house, killing B. and Bob. K. was rescued and taken to a hospital for treatment for smoke inhalation.

B.W. was arrested upon her return and R. immediately placed in a foster home. K. joined her brother several days later, upon her release from the hospital.

Both children were then removed to a second foster home, where they stayed until October 1976. At that time they

were placed in a third foster home with Mr. and Mrs. B., where they have remained until the present time.

For any adult to leave children of these ages unattended — save for an emergent reason — is an act in derogation of a singular responsibility. Unfortunately, B.W.'s gross judgmental error, however innocently made and sincerely regretted, has resulted in consequences that shall stand for all time.

The evidence in this case compels the finding that B.W. is guilty of an act of neglect against three of her children. The evidence further supports the finding that this was the only incident of neglect shown.

These two children have spent about one year in the B. household. The foster home is described, in one of the numerous social/psychological evaluations presented in this case, as "being able to provide the stimulation, nurturing, guidance and structure" the children need. As noted previously, this is the third foster home that K. and R. have lived in since the night of the fire. Throughout this entire period there has been an unbroken chain of visitation between B. W. and her two children.

By order of this court, visits were for one hour a week in the office of the Division, until January 26, 1977. At that time visitation was increased, by court order, to three hours a week in the home of B.W. The initial schedule was reinstated on February 18, 1977 in order to minimize the trauma being experienced by the children.

There was substantial testimony relating to the increasing difficulty that the caseworker was encountering in returning the children to their foster home after each visit with B.W. This difficulty stemmed from the children themselves, not from any interference by their mother. B.W. fully cooperated with the caseworker in her attempts to minimize this problem.

The caseworker handling the visitation stated:

* * * the first [at home] visit was hard, but it keeps gettin' harder, * * * to the point where last week Karen was hiding and she

wouldn't * * * put on her coat * * * she got behind the door and she was holding on, she didn't want to go, to the point of them threatening me, K. threatening me if I didn't take 'em back, and screaming and crying the whole way home 'till I got maybe fifteen, twenty minutes * * * away from the home.

The caseworker further testified that the difficulty in getting the children out of B.W.'s home for the return trip necessitated her use of subterfuge in order to get them into the "state" car.

Mrs. B. felt it necessary to avoid letting the children know until the last possible moment that they were going to visit B.W. They were so "happy" at the impending visit that they would immediately "start getting excited" and "run around" in anticipation. This disruption of the household routine continued upon their return. K. would tell Mrs. B. that she wanted to stay with B.W. R. experienced nightmares and "constant" need for reassurance.

Both Mrs. B. and B.W. are referred to as "Mommy" by the children. However, Mr. B. is referred to as "Uncle Ray," while P. (the boyfriend) is referred to as "Daddy." The relationship between the Bs and the children, albeit a loving and nurturing one, has not resulted in the displacement of B.W. in the minds and hearts of K. and R. They still relate to their biological mother as their psychological parent. Time and distance have not abated the intensity of their feelings.

The significance of "psychological parenthood" is gaining recognition as an important factor in determining custody based on the "best interests" standard. *In re Adoption of J.,* 139 *N. J. Super.* 533 (App. Div. 1976), dissenting opinion of J. Crahay upheld 73 *N. J.* 68 (1977); *In re P and wife,* 114 *N. J. Super.* 584 (App. Div. 1971); *D.Y.F.S. v. Huggins,* 148 *N. J. Super.* 86 (J. & D.R. Ct. 1977); *Sees v. Baber,* 74 *N. J.* 201 (1977). *See Smith v. OFFER,* 431 *U. S.* 816, 97 *S. Ct.* 2094, 53 *L. Ed.* 2d 14 (1977).

This psychoanalytic theory was first enunciated in the book, *Beyond the Best Interests of the Child,* by Joseph

Goldstein, Anna Freud and Albert Solnit (1973). In describing the evolution of psychological parenthood, the authors state:

> * * * *for the child,* the physical realities of his [or her] conception and birth are not the direct cause of his [or her] emotional attachment. *This attachment results from day-to-day attention to his [or her] needs for physical care, nourishment, comfort, affection, and stimulation.* Only a parent who provides for these needs will build a psychological relationship to the child on the basis of the biological one and will become his [or her] "psychological parent" in whose care the child can feel valued and "wanted." [at 17; emphasis supplied].

It is the finding of this court that B.W. is clearly the present psychological parent of K. and R. It is she who, even now, meets their need for "unbroken continuity of affectionate and stimulating relationships with an adult." *Beyond the Best Interests of the Child, supra* at 6; *D.Y. F.S. v. Huggins, supra* 148 *N. J. Super.* at 94.

Because the biological parent and the psychological parent are one and same individual, the return of K. and R. to B.W. would not result in a "summary and drastic change" in their life circumstances likely to cause them "serious psychological injury." *Sorentino v. Family & Children's Soc. of Elizabeth,* 72 *N. J.* 127, 131 (1976) (hereinafter *Sorentino I*); *Sorentino v. Family & Children's Soc. of Elizabeth,* 74 *N. J.* 313 (1977) (hereinafter *Sorentino II*). That "summary and drastic change" occurred on the day of the fire. The reunion of this family would terminate the continuing psychological trauma of the children. Moreover, in a *per curiam* decision the Supreme Court in *Sorentino II* stated:

> * * * the maintenance of stable, continuing relationships between parent and child * * * is the basis for the policy behind custody cases which provides for parental visitation. The parent-child relationship is maintained with the hopeful expectation that the natural parent will be able in the future to resume permanent custody of the child. [at 322–323, citing *Doe v. G. D.,* 146 *N. J. Super.* 419 (App. Div. 1967), aff'd *sub nom., Doe v. Downey,* 74 *N. J.* 196 (1977)].

However, the fact that B.W. is the present psychological parent does not automatically mean that the "best interests" of K. and R. will be served by returning them to her.

In actions for permanent termination of parental rights the court must base its decision on the "best interests" of the child. *N. J. S. A.* 30:4–C 15, 20. "Even parental rights must yield to this principle." *In re Mrs. M.,* 74 *N. J. Super.* 178 ('App.' Div. 1962).

Before terminating the rights of a biological parent the court must find that it has been affirmatively established that:

\* \* \* the child's "best interests" will be *substantially prejudiced if* he [or she] is permitted to remain with his [or her] parent — *e. g.,* that his [or her] health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in some way *incapable of caring for the child or unwilling to do so. [In re Cope,* 106 *N. J. Super.* 336, 341 (App. Div. 1969), emphasis supplied].

The "best interests" standard has been defined as the "safety, happiness, physical, mental and moral welfare of the child." *Sheehan v. Sheehan,* 51 *N. J. Super.* 276 (App. Div. 1958). However, more must be shown than that another's care has proven to be "more beneficial" to a child than that of its parent. *In re Cope, supra,* 106 *N. J. Super.* at 340; accord, *Doe v. G.D., supra.*

*In Doe v. G.D.* the court held that child neglect or abuse is not established by the existence of crowded, dirty and inadequate living conditions or other "unfortunate incidents of poverty."

Adoption of such facts as a basis for a finding of child neglect or abuse might result in mass transfers of children from ghettos and disadvantaged areas into more luxurious living accommodations but with resultant destruction of the natural parental bond. This clearly was not the design of the statute nor the intent of the Legislature. [146 *N. J. Super.* at 431].

Further, "the more subtle and intangible incidents of a home environment * * * which hopefully would encourage beneficial intellectual growth" were never intended by the Legislature to be subject to "governmental monitoring." *Ibid.*

The evaluations of K. and R. after the fire indicated a measure of developmental lag in socialization and intellectual functioning. These tests occurred during stressful times, which may have depressed their scores. There has been improvement in these areas. However, there is no indication that this improvement will not continue if the children are returned to B.W.'s care. K. has been attending a special school program recommended by the child study team. Her continuance in this program is not contingent upon her residence. Neither is there any indication that any problems evidenced by the children are grounded in events prior to the fire.

The evidence in this case fully supports the finding that B.W. is willing to care for her children. The critical issue then, is whether she is incapable of caring for them.

B.W.'s verbal I.Q. was placed by an independent psychological evaluation in the educable, mentally retarded range. The psychologist stated that she is not "consciously neglectful * * * nor * * * abusive toward [the children], but rather does not know how she should behave in her present role."

Two psychiatrists who examined B.W. on separate occasions reached different conclusions. They have never seen the children.

Dr. Glass concluded that the children should be returned to B.W. with initial utilization of support services; she has the "capacity" to impart warmth and discipline to her children and to "care for their daily needs."

Dr. Rogers concluded that while B.W.'s level of intelligence did not, in itself, mean that she is incapable of caring for her children, her level of maturity would preclude her from adequately caring for them. He expressed the

opinion that the children should not be returned to B.W. until her "lifestyle" evinces improvement in her abilities. B.W. and her mother "appeared to us to be kind of backwoods sort of people, unsophisticated, not well educated, disadvantaged people."

Initiation into "polite society" cannot be made a prerequisite to a biological parent's right to custody of her children.

"The child's relationship with the parent is of such significance that all doubts are to be resolved against its destruction." *In re Guardianship of B.C.H.*, 108 *N. J. Super.* 531, 537 (App. Div. 1970).

B.W. is completely amenable to any and all forms of supervision that the court might deem necessary to impose.

Legislative and judicial policy have dictated that the child's "best interests" be protected "so far as practicable" by providing welfare services to support and maintain the integrity of the biological family as a living unit. *N. J. S. A.* 30:4C–1 *et seq.; In re Cope, supra; In re Guardianship of B.C.H., supra.* As recently as September 7, 1977 the Legislature reaffirmed this principle — even in cases where outright physical abuse has occurred. *N. J. S. A.* 9:6–8.50(e).

This public policy supports the principle of the "least detrimental available alternative" enunciated in *Beyond the Best Interests of the Child, supra.* The authors state:

The least detrimental alternative * * * is that * * * procedure for [child] placement which maximizes, in accord with the child's sense of time * * * his or her opportunity for being wanted and for maintaining on a *continuous* [unconditional and permanent] basis a relationship with at least one adult who is or will become [the child's] phychological parent. [at 53].

B.W. has used available support services in the past. This bespeaks of her dearth of material resources and her concurrent recognition of her responsibility to secure the necessities of life for her children. She also recognizes the

need for interaction with her children. B.W. believes that "when you have children you have to play with 'em, even how silly you look but still in all you have to play with your children."

The declared public policy of this State to use "welfare services" to assist families to stay together cannot be inverted and used as supporting evidence for the dissolution of families.

The Division caseworker, who was assigned to assist this family throughout the period when collateral support services were being used, at no time felt any concern over the quality of B.W.'s parenting. Two other Division caseworkers observed the warm physical interaction of the family during office visitation. B.W.'s volunteer probation counselor formed favorable impressions of her ability to manage a household and budget after the occurrence of at least seven home visits.

A fourth Division caseworker was present during the in-home visitation. She observed the cleanliness of the apartment and B.W. putting "restraints" on the children's activities. B.W. would hide the matches. She would stop R. from playing around the hall steps and bannister, or trying to lean out of a window. She would "[explain] to him that he couldn't do that, 'cause he could fall and hurt himself."

This court finds that there is no credible evidence of any abuse or neglect by B.W. prior to the day of the fire, or at any time therafter. There is no spectre of continuing danger to the children. There is an isolated incident of neglect, rooted in judgmental error.

*In Doe v. G.D., supra,* the trial court decided to continue the custody of the child in the foster parents. Two psychiatrists had recommended that this be done because the mother was "immature, of inadequate personality and poor ego strength." Moreover, the child "showed signs of emotional disturbance" stemming from "maternal deprivation." The Appellate Division reversed, stating:

\* \* \* whatever the diagnosis or prognosis of [the child's] mental and emotional condition may be, it is not caused by conditions existing in either the home life provided by [her mother] or that provided by the foster parents. It is firmly grounded in the trauma resulting from being shuttled between the two divergent and conflicting environments. [146 *N. J. Super.* at 432].

This court can find no legal justification for terminating the parental rights of B.W. Plaintiff has not met its burden of proof as set forth in *In re Cope, supra.* Under the principle of *Doe v. G.D., supra,* to hold otherwise, "would be to sanction state intrusion into the personal relationship between parent and child to an intolerable degree and would impermissibly impair the normal prerogatives of parenthood." [at 431].

This court is compelled to determine that the "best interests" of K. and R. mandate their return to B.W. This is the least detrimental available alternative at this juncture.

K. and R. will be placed under the protective supervision of the Division for a period of one year. This supervision shall include defendant's acceptance of homemaking services and attendance at parenting-education classes. B.W. will provide for adequate housing and the caseworker shall regularly conduct scheduled and unscheduled visits to her home. The children shall not be placed in the long-term care of anyone other than their mother without the prior approval of the Division.

Any party to this action may apply to this court for an extension of this order at any time during the period of its existence.