**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4492-15T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

N.H.,

    Defendant-Appellant,

and

C.J., SR.,

    Defendant.

_____

IN THE MATTER OF C.J., JR., a Minor.

_____

        Submitted March 8, 2018 – Decided August 21, 2018

        Before Judges Simonelli and Gooden Brown.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Bergen County,
        Docket No. FN-02-0137-15.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Arthur D. Malkin, Designated
        Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Kenneth M. Cabot, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant N.H.[1] appeals from the Family Part's December 30, 2015 order, concluding, after a fact-finding hearing, that she abused and neglected her son, C.J., Jr., born in April 1998, within the meaning of N.J.S.A. 9:6-8.21(c).[2] We affirm, substantially for the reasons set forth in Judge Mary F. Thurber's written opinion accompanying the order.

Judge Thurber's twenty-six-page opinion, which we incorporate by reference, sets forth the facts in detail. The judge conducted an eleven-day fact-finding hearing, during which the Division of Child Protection and Permanency (Division) presented seven witnesses. Division caseworker Jovan Owimrim and Division intake worker Elizabeth Vega-Valentin detailed the Division's involvement with the family. School psychologist Neal Llaverias, to whom C.J., Jr. first disclosed the abuse, testified for the Division.

---

[1] We use initials to protect the confidentiality of the participants in these proceedings pursuant to Rule 1:38-3(d).

[2] There was no finding against C.J., Sr., C.J., Jr.'s biological father, who had been "largely absent from his life."

A-4492-15T2

Ridgefield Police Detective Joseph Castellitto and Bergen County Prosecutor's Office Detective Kelly Krenn testified about the criminal investigation of the allegations. Expert child psychologist Anthony V. D'Urso, Psy.D., testified about C.J., Jr.'s psychosocial evaluation, which he supervised at the Audrey Hepburn Children's House (AHCH). Julia DeBellis, M.D., an expert in child abuse pediatrics, testified about the medical evaluation she conducted on C.J., Jr. at the AHCH.

Defendant testified on her own behalf and presented the testimony of her partner, J.H.[3] The judge also reviewed videotaped interviews of defendant, J.H., and C.J., Jr. conducted at the Bergen County Prosecutor's Office, and admitted numerous documentary exhibits into evidence, including Division contact sheets, screening and investigation summaries, certified hospital records, and police reports. As Judge Thurber noted,

> This case involve[d] two main areas of factual dispute. The first concern[ed] the stabbing incident on August 21, 2014. [C.J., Jr.] and the Division contend that [defendant] stabbed [C.J., Jr.] on that date, and that she and [J.H.] then persuaded [C.J., Jr.] to join them in fabricating a story about how he got stabbed, and in lying to the police and to hospital staff. [Defendant], on the other hand, contends the story [C.J., Jr.] told in August was true, and that he is now lying and falsely accusing her. The second primary area

---

[3] J.H. was alternately referred to in the record as defendant's fiancée, common law wife, and live-in paramour.

of dispute concern[ed] the history of abuse reported by [C.J., Jr.] and denied by his mother. For reasons set forth herein, the court is convinced defendant . . . did in fact stab her son on August 21, 2014, and that she engaged in a long course of physical and emotional abuse over many years.

In making her decision, the judge "listened closely to the witnesses' testimony and observed their body language, character, and demeanor to assess the reasonableness of their testimony, and whether they had motive to prevaricate." In that regard, Judge Thurber found the testimony of law enforcement and Division personnel to be credible and reliable. The judge described their testimony as "straightforward and to the point." According to the judge, the "[f]acts set forth in their testimony were corroborated by documentary evidence as well as by one another's testimony." Similarly, the judge described the school psychologist's detailed testimony as "clear and consistent." Likewise, the judge found both Drs. D'Urso's and DeBellis' testimony "concerning [C.J., Jr.'s] mental health and physical evaluations" were "extremely helpful to the court" and "corroborative of [C.J., Jr.'s] out-of-court statements."

In contrast, Judge Thurber described defendant's and J.H.'s testimony as "wholly lacking in credibility." According to the judge, "[t]hey contradicted themselves and one another on multiple factual issues, and made statements that were patently

unbelievable."  Additionally, "[t]heir testimony and prior statements . . . were in some instances disproven with irrefutable (or unrefuted) proofs."  As to defendant specifically, the judge noted that defendant's reactions during the trial "were frequently volatile" and "occasionally theatrical or melodramatic."

In her comprehensive opinion, Judge Thurber reviewed the history of the Division's involvement with the family, beginning with a 1999 report of C.J., Jr.'s developmental delays.  The Division also responded to a 2001 report of bruising on C.J., Jr.'s face and apparent belt marks on his legs, but the case was closed.  Additionally, a 2008 report that defendant was smoking marijuana and selling drugs from her home was determined to be unfounded.  Finally, in August 2014, the Division received an informational call from hospital staff that defendant was resisting recommended treatment for C.J., Jr., who was being treated for a stab wound.  The dispute between defendant and the hospital was resolved, and the Division took no further action at that time.

Although the August 2014 incident ultimately precipitated the Title Nine litigation that is the subject of this appeal, the true nature of the incident did not become apparent until October 30, 2014, when the Division received a referral from school personnel reporting that C.J., Jr. was being verbally and physically abused

by his mother. On that date, C.J., Jr. played a recording for the school psychologist, which he made on his Ipod on or about October 27, 2014. In it, defendant could be heard screaming, "I wish you would kill yourself. If you did, no one would care. You make me want to kill myself." C.J., Jr. reported continuous verbal abuse and taunting similar to the recording, frequent beatings with various objects, including a belt and a drumstick, and being stabbed in the back in August 2014 when C.J., Jr. was taken to the hospital.

In response to these allegations, the Division executed an emergency removal of C.J., Jr., pursuant to N.J.S.A. 9:6-8.29[4] and 9:6-8.30, and later filed a verified complaint for his custody, care, and supervision, pursuant to N.J.S.A. 9:6-8.21 and 30:4C-12, resulting in C.J., Jr. initially being placed in a youth shelter and then in successive Division-approved resource homes. Of concern to Judge Thurber was defendant's attitude towards her son after he was removed, which the judge described as "a vengeful, spiteful reaction, and a complete insensitivity to the trauma her child was undergoing."

In the ensuing investigation, C.J., Jr. was interviewed by caseworker Vega-Valentin and, later, Detective Krenn. In

---

[4] N.J.S.A. 9:6-8.29 permits the emergency removal of a child from the parent's custody without a court order.

Detective Krenn's recorded interview, C.J., Jr. detailed the circumstances of the stabbing incident. C.J., Jr. stated that during a verbal altercation in his bedroom, defendant hit him, yelled at him, stuffed a scarf in his mouth, and tied it in place with a shoe string. A struggle ensued, and "[t]hey end[ed] up wrestling on the floor." During the struggle, defendant accused C.J., Jr. of biting her, and, in turn, bit his fingers and arm. Then, she left the room and returned with a kitchen knife.

Despite C.J., Jr.'s pleas, defendant cursed at him and taunted him, stating repeatedly "You think I'm a f****** joke? You thought I was joking. I'm no f****** joke." Then, defendant "jab[bed] him with the knife, first on his arm, then between his left armpit and left shoulder blade." After defendant left the room, C.J., Jr. sat down beside a radiator, feeling dizzy, sick, and in pain. He held his side, where he felt blood gushing from a wound.[5] When defendant returned to C.J., Jr.'s bedroom and saw the blood, she exclaimed, "Oh my God, I'm so sorry, I'm so sorry." She started crying and went to get him a glass of water and "a rag to put pressure on the wound."

At that point, J.H. returned from walking the dog and, after convincing C.J., Jr. to lie about what happened, called an

---

[5] When C.J., Jr. was interviewed by Vega-Valentin at his home, he pointed out purported blood stains on the radiator in his bedroom.

ambulance over defendant's and C.J., Jr.'s objections. To protect defendant, they agreed to say that C.J., Jr. had gone to the park, where he was jumped and stabbed by men he did not recognize. Fearing that she would be arrested, defendant left the apartment before the police arrived. When the police and EMT personnel arrived, C.J., Jr. and J.H. both told the concocted story.

Defendant and J.H. maintained that defendant was not home when C.J., Jr. was stabbed. However, as Judge Thurber pointed out, during the course of the investigation as well as their trial testimony, there were discrepancies and conflicts between their accounts. Defendant claimed that when the stabbing occurred, she was with a friend who was driving two of her cousins to the airport. Defendant stated she took the dog with her to the airport and left after C.J., Jr. went to play basketball. However, contrary to defendant's version, J.H. stated that C.J., Jr. was still at home when defendant left for the airport and that defendant left the dog at home with her.

Additionally, although defendant claimed she learned of the stabbing while on her way home from the airport, she said she went home first and asked the superintendent of her building for a ride to the hospital, rather than having her friend take her to the hospital. There were also discrepancies concerning how defendant and J.H. were notified about the stabbing and whether defendant

8

or J.H. owned a car, thus obviating the need for defendant's reliance on her friend for transportation to the airport.

Despite requests, defendant provided no contact information for her friend or her cousins to verify her account. Judge Thurber pointed out that

> [i]t [was] noteworthy . . . that [defendant] never provided the information that would have allowed law enforcement personnel or the Division to contact [her friend] or the cousins who allegedly visited on the day of the stabbing. Nor did she bring forward the building superintendent, who could presumably have testified to having learned of the stabbing and having told [J.H.].

The judge found that "if any of defendant's version of the stabbing incident [was] true, she would have and could have brought forward, at the time of investigation or at the time of trial, one or more of the witnesses who could substantiate her story."

During the police investigation of the stabbing, Ridgefield police reviewed video camera footage of all areas of the park where C.J., Jr. was allegedly stabbed, but found no evidence of him being in the park. The police ultimately closed the case because there was no evidence to support the allegation and C.J., Jr. and defendant were not cooperating with the investigation.

C.J., Jr.'s ultimate disclosure to the school psychologist on October 30, 2014 was precipitated by a verbal dispute between defendant and C.J., Jr. about homework. Defendant received a

Facebook message from C.J., Jr.'s friend telling her that C.J., Jr. was "hanging out" and not staying after school to do homework as he had told her. When he came home, she confronted him and demanded to see his homework. Although C.J., Jr. insisted that he had been at school, defendant did not believe him, prompting C.J., Jr. to record the ensuing verbal altercation that he later played for the school psychologist and, ultimately, the Division caseworker and the police. When questioned about the confrontation, defendant denied making the statements heard on the recording, and J.H. insisted that defendant would never say such things.

C.J., Jr.'s November 18, 2014 psychosocial evaluation clinically substantiated that he had suffered physical, emotional, and psychological abuse and had been exposed to substance abuse while living with defendant. The emotional abuse consisted of threatening and intimidating behavior over a long period of time, including being subjected to disparaging name calling such as "stupid, mother******, jackass, [and] no good in life[,]" coupled with a high level of conflict in the home. Dr. D'Urso explained that C.J., Jr. agreed to lie about the stabbing in August because he was intimidated and felt threatened, and delayed disclosure of abuse was not uncommon in such cases. From the evaluation, Dr. D'Urso concluded that C.J., Jr. suffered from adjustment disorder

with mixed anxiety and depressed mood, and recommended trauma-focused cognitive behavioral therapy.

C.J., Jr.'s November 7, 2014 medical evaluation identified a number of healed scars, each of which C.J., Jr. attributed to an assault by defendant. Although Dr. DeBellis testified that the scars were consistent with C.J., Jr.'s account, she could not confirm the causes. As to the stab wound, Dr. DeBellis concluded that it healed with significant scar tissue, which usually occurred when there was significant tissue damage. She described it as a sharp penetrating injury, which reflected a deep laceration. She testified that there was the potential for a much more serious injury based on the location of the stab wound. She determined that an injury to that area, as well as to the head, face, eyes, ears, and belly, were unlikely to be caused accidentally. Based on the American Academy of Pediatrics' definition of corporal punishment, Dr. DeBellis concluded that C.J., Jr.'s injury constituted child abuse.

Judge Thurber determined that defendant's acts of "stab[ing] her son with a knife on August 21, 2014, after striking him, attempting to gag him, and tying a scarf in his mouth with a shoelace . . . clearly satisf[ied] the definition [of abuse] under N.J.S.A. 9:6-8.9(a)." Additionally, the judge was

11

more than satisfied that the manner in which defendant treated her son, the physical assaults, the barrage of emotional abuse, the intimidation, the threats . . . combined to create both actual harm (as testified to by Dr. D'Urso) and a substantial risk of ongoing harm to both his physical and emotional well-being. The court [found] it especially egregious and troubling that this mother, who claimed to have championed and protected her son, mindful of his severe limitations,[6] engaged in this behavior.

Defendant now appeals, arguing that "[b]ecause of all the contradictory evidence and testimony, the conclusions of the court . . . were not supported by the underlying facts" and "are clearly mistaken and unwarranted." According to defendant, "C.J., Jr. is simply not credible" because "[h]e described childhood abuse that was not corroborated elsewhere" and because he "gave a detailed account of the stabbing in August of 2014, and only changed his story after a confrontation with his mother in October 2014." Further, defendant "was not charged with a crime" and "had no prior substantiations." Thus, according to defendant, "[t]he Division has not proven that C.J., Jr. is an abused or neglected child, as defined by N.J.S.A. 9:6-8.21." We disagree.

---

[6] The judge found C.J., Jr. "suffer[ed] significant cognitive limitations. . . . His IQ is borderline, and he has academic difficulties, including problems with reading comprehension and math calculations." Additionally, he "has been classified since an early age . . . and has an [Individualized Educational Program] that affords him several accommodations."

Our standard of review of the Family Part's fact-finding determination is limited. We accord considerable deference to the family court's credibility determinations and findings of fact, so long as those findings are supported by adequate, substantial, and credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007). Because the family court has "the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand . . . [and] a 'feel of the case' that can never be realized by a review of the cold record[,]" N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293), we maintain that deference "unless the trial court's findings 'went so wide of the mark that a mistake must have been made.'" M.M., 189 N.J. at 279 (quoting C.B. Snyder Realty Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). Moreover, we do not readily second-guess the factual findings of the Family Part in general, given that court's "special jurisdiction and expertise in family matters[.]" Cesare v. Cesare, 154 N.J. 394, 413 (1998).

Applying that limited and well-settled scope of review, we affirm the judge's finding of abuse and neglect, substantially for the sound reasons expressed in Judge Thurber's December 30, 2015 written opinion. We add only a few comments.

An abused or neglected child is:

13                                    A-4492-15T2

> [A] child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

In order "[t]o find abuse or neglect, the parent must 'fail . . . to exercise a minimum degree of care[,]'" which requires "conduct that is grossly negligent because it is willful or wanton . . . but not necessarily intentional." N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 179 (2015) (first quoting N.J.S.A. 9:6-8.21(c)(4)(b), then quoting G.S. v. Div. of Youth & Family Servs., 157 N.J. 161, 178 (1999)).

The purpose of Title Nine is "to protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from further injury and possible death.'" N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 18 (2013) (quoting N.J.S.A. 9:6-8.8(a)). Thus, "[t]he law's 'paramount concern' is the 'safety of the children,' and 'not the culpability of parental conduct[,]'" and "[t]he focus in abuse and neglect matters . . . is on promptly protecting a child who has suffered

harm or faces imminent danger."  Ibid. (citations omitted) (first quoting N.J.S.A. 9:6-8.8(a), then quoting G.S., 157 N.J. at 177).

A court's finding of abuse or neglect must be based on a preponderance of the evidence when the proof is considered in its totality.  N.J.S.A. 9:6-8.46(b)(1); N.J. Div. of Youth & Family Servs. v. C.M., 181 N.J. Super. 190, 201 (J. & D.R. Ct. 1981). "In child abuse and neglect cases[,] the elements of proof are synergistically related.  Each proven act of [abuse or] neglect has some effect on the child[].  One act may be 'substantial' or the sum of many acts may be 'substantial.'" C.M., 181 N.J. Super. at 201.  Guided by these principles, we are convinced that the proofs adduced before Judge Thurber amply met these evidentiary standards, and the judge's findings of abuse and neglect are unassailable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4492-15T2