# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1373-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.S.,

      Defendant-Appellant,

and

T.C.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.C.,
a minor.

_____

Argued February 24, 2021 – Decided March 25, 2021

Before Judges Fuentes, Rose, and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0240-19.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Ryan T. Clark, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Rachel E. Seidman, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Rachel E. Seidman, of counsel and on the brief).

PER CURIAM

Defendant M.S.,[1] the biological mother of "Amy," a girl born in August 2011, appeals from the order of the Family Part terminating her parental rights. Although the judge also terminated the parental rights of Amy's biological father, T.C., he did not appeal. M.S. contends the Division did not demonstrate by clear and convincing evidence the four prongs of N.J.S.A. 30:4C-15.1(a). The law guardian supports termination and urges us to affirm the trial judge.

---

[1] The parties and other individuals are identified by initials and pseudonyms because records relating to Division of Child Protection and Permanency (Division) proceedings "are excluded from public access." R. 1:38-3(d)(12).

Having reviewed the record in light of the contentions of the parties and the applicable law, we affirm.

I.

The record shows Amy was born with significant medical issues, including underdeveloped lungs, and was diagnosed with respiratory distress and failure to thrive. At birth, she underwent surgery to repair a heart valve, and suffered complications when the surgeon lacerated her phrenic nerve. As a result, she required a tracheostomy tube, feeding tube, and nursing care sixteen hours per day. Amy experienced global developmental delays and was diagnosed with DiGeorge Syndrome,[2] asthma, and Attention-Deficit Hyperactivity Disorder. She received speech therapy.

---

[2] "DiGeorge syndrome, more accurately known by a broader term—22q11.2 deletion syndrome—is a disorder caused when a small part of chromosome 22 is missing. This deletion results in the poor development of several body systems." DiGeorge Syndrome (22q11.2 deletion syndrome), Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/digeorge-syndrome/symptoms-causes/syc-20353543 (last visited Mar. 3, 2021). "Medical problems commonly associated with 22q11.2 deletion syndrome include heart defects, poor immune system function, a cleft palate, complications related to low levels of calcium in the blood, and delayed development with behavioral and emotional problems." Ibid. "The number and severity of symptoms associated with 22q11.2 deletion syndrome vary. However, almost everyone with this syndrome needs treatment from specialists in a variety of fields." Ibid.

A-1373-19

In August 2013, Amy's nursing agency made a referral to the Division hotline alleging M.S. did not respond to attempts to contact her, faced eviction from her apartment, and was not home on several occasions when the nurse's shift ended. M.S. reported she was evicted after her social services assistance ended, and she planned to temporarily live with her mother. Because M.S. had attended Amy's medical appointments with multiple specialists, she was unable to comply with the work program requirements. M.S. also advised the caseworker that two years earlier, T.C. punched her, but she declined to press charges.

On September 10, 2013, M.S. informed the Division that her parents' apartment was infested with bed bugs. The Division gave the family a $150 check to wash clothing and linens. On January 24, 2014, M.S. informed the Division that she was about to be evicted from the apartment she was renting for non-payment of rent, and that she was unemployed. In response, the Division paid $850 towards M.S.'s rent, provided her with a list of community housing resources, and referred her to Family Life Skills to assist with parenting skills and employment searches.

On August 27, 2014, M.S. was evicted from her apartment, and some of Amy's medical equipment was left behind. Another referral was made to the

4

Division by the nursing agency, which increased its services from sixteen hours per day to twenty-four hours per day because of its concerns regarding M.S.'s care of Amy. On September 2, 2014, M.S. signed a safety protection plan, agreeing to round-the-clock nursing care for Amy. Because of the need for M.S. to consistently attend Amy's medical appointments, the Division arranged for transportation for M.S. to attend subsequent appointments for Amy.

On September 15, 2014, the Division received a referral that T.C., who was incarcerated for selling drugs, had been released and moved into his mother, K.C.'s home. Following an argument with T.C., M.S. left for the weekend, leaving Amy in the care of T.C., K.C., and the nursing staff. That day, the Division conducted an emergency removal pursuant to the Dodd Act[3] and placed Amy with D.J., an unrelated foster parent. On September 17, 2014, a prior judge found that the Division's removal of Amy was appropriate but ordered her returned to M.S.'s custody. The judge ordered M.S. to allow the Division and nursing agency access to the home and prohibited M.S. from leaving Amy alone in the nurse's care.

---

[3] A "Dodd removal" is an emergency removal of a child from the custody of a parent without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82

In the Fall of 2014, the Division referred M.S. for a substance abuse assessment due to her alleged alcohol use, to undergo a psychological evaluation, and to search for employment. On December 3, 2014, M.S. advised the Division she got into an argument with T.C., and R.G., who was K.C.'s paramour, punched M.S. in the face. The Division placed M.S. and Amy in a motel for two months, provided a security deposit, and one month's rent.

On January 6, 2015, Dr. Gerald A. Figurelli evaluated M.S., who opined that she required mental health treatment, lacked an adequate understanding of children's developmental needs, and was at risk of engaging in child maltreatment if she did not receive support. Dr. Figurelli recommended drug testing to confirm her denial of use, domestic violence counseling, assistance with job training, and parenting skills classes.

At the March 15, 2018 permanency hearing, the judge ordered M.S. to participate in substance abuse treatment, submit to random urine screens, attend Amy's medical appointments, and cooperate with Amy's nursing services. The judge also ordered the Division to refer M.S. to legal services to explore filing a medical malpractice lawsuit against Amy's surgeon relating to her procedure at birth. At oral argument before this court, counsel was unsure of the status of the referral, and the law guardian was requested to follow up.

A-1373-19

In July 2015, M.S. moved into a new apartment with Amy, with Section 8 assistance, and the Division paid her security deposit. In September, M.S. failed to pay her portion of the rent. M.S. also failed to make an appointment for Amy with an ear, nose, and throat specialist as discussed, but did enroll her in school. In November 2015, M.S. and Amy were evicted, and M.S. did not have a plan as to where they would live. M.S. and Amy moved in with M.S.'s parents, F.S. and A.S., and the Division and caseworker had to retrieve Amy's medical equipment and belongings and bring them to the grandparents' house. By December 2015, M.S. often stayed with friends during the week and returned to the home occasionally, prompting another referral to the Division by Amy's nurses. The Division prepared a family agreement, signed by M.S. and the maternal grandparents, authorizing Amy to receive twenty-four-hour nursing care.

On January 26, 2016, the Division filed a complaint for custody of Amy. The judge granted the Division's application based on M.S.'s noncompliance with treatment for Amy's care, her unavailability during medical emergencies, and lack of stable housing. The Division ruled out the maternal grandparents, F.S. and A.S., as a family placement because of their noncompliance with nursing staff and alleged inability to understand Amy's medical needs. K.C. and

R.G. were also ruled out due to their history of domestic violence and R.G.'s criminal conviction for a controlled dangerous substance, along with his refusal to undergo a substance abuse evaluation. Amy's maternal uncle was also ruled out. Consequently, the Division placed Amy in the home of a non-relative resource parent, D.P., which was not a pre-adoptive home, but could accommodate Amy's nursing assistance.

In addition, the Division referred M.S. for the following services: a substance abuse assessment; domestic violence counseling; individual and couples counseling; and an updated psychological evaluation. On March 3, 2016, M.S. completed a substance abuse assessment and tested negative for all substances.

Amy's preschool classified her for special education due to her medical condition and provided her and her nurses with transportation as part of an Individualized Education Plan (IEP). During this time, M.S. had consistent weekly, supervised visits with Amy arranged by the Division. On March 9, 2016, Dr. Figurelli completed a second psychological evaluation of M.S. and again opined she did not have a psychiatric illness that required formal mental health treatment. He reported, however, that she was "not yet prepared to independently provide consistently responsible, safe, and stable parenting to her

A-1373-19

child." Dr. Figurelli recommended that M.S. be reassessed when she secured stable living arrangements, adequate financial support, and participated in services.

Between June and September 2016, M.S. failed to attend three appointments scheduled by the Division for a substance abuse evaluation. On July 19, 2016, she provided a urine sample, which tested positive for oxycodone and alcohol. On July 25, 2016, Amy underwent surgery to remove her tracheostomy tube. The caseworker transported M.S. to the hospital for the procedure. The Division was notified that M.S. and T.C. missed thirteen counseling appointments and the provider closed its case.

During the latter half of 2016, M.S. only visited Amy sporadically and cancelled several family team meetings and other appointments. On January 6, 2017, the Division received a referral from a hospital employee alleging that M.S. was treated in the emergency room for a skin abscess and admitting to drinking alcohol daily. M.S. later denied drinking daily to the caseworker but tested positive for alcohol on February 8, 2017. She began working part-time at Walmart and later as a hairdresser.

Amy's health improved, and by February 2017, the nursing agency reduced her care from twenty-four hours per day to sixteen hours. M.S. missed

A-1373-19

several of Amy's medical appointments and did not contact any of her doctors to discuss her care. In July 2017, M.S. experienced pancreatitis due to alcohol use. She did not seek reunification with Amy at that time.

On November 15, 2017, Dr. Figurelli evaluated M.S. for a third time and reached the same assessment and recommendations espoused in his two previous reports. In addition, Dr. Figurelli recommended M.S. participate in a substance abuse evaluation to ascertain whether or not she was experiencing a psychoactive substance abuse disorder that required formal treatment.

In the judge's January 2018 decision denying the Division's guardianship application, the judge found the Division proved the first three prongs of the best-interest-of-the-child test. However, the judge found the Division failed to meet the fourth prong because Amy had a relationship with M.S., T.C., and relatives. In addition, the judge found M.S. began services and was not at risk for engaging in child maltreatment; the only significant concern was her lack of stable housing. The judge also noted that Amy was not in a resource home that was willing to adopt her.

At the permanency hearing held on March 15, 2018, the judge ordered defendant to participate in substance abuse treatment, submit to random urine screens, attend individual counseling, attend Amy's medical appointments, and

A-1373-19

cooperate with her nursing services so M.S. could better understand her daughter's medical needs. M.S. continued to miss domestic violence counseling sessions, individual counseling and parenting classes, and ceased attending these services altogether in July 2018. M.S. also missed two of Amy's doctor's appointments and her IEP meeting. Further, M.S. failed to submit to court-ordered random drug screens, a hair follicle test, and a substance abuse assessment.

In May 2018, the Division began assessing Mary, Amy's former nurse, and Aaron, her husband, as a potential resource placement. They were open to adopting Amy. In June 2018, Amy was able to discontinue using her feeding tube. M.S. continued to resist applying for Section 8 housing and inconsistently attended Amy's medical appointments. The Division provided M.S. with a prepaid cell phone and offered her transportation. On December 18, 2018, the Division placed Amy in the home of Mary and Aaron, which remained a pre-adoptive home.

A foster child (Robert), six years old at the time, who was a victim of sexual abuse by other children, lived in Mary and Aaron's home. Shortly after the Division placed Amy in the home, Robert pulled down her pants, but not her underwear, while the two danced, because he wanted to see her buttocks.

11

Consequently, the Division implemented a family agreement, which provided that Mary and Aaron would supervise the children at all times they were together and referred both children to in-home counseling.

In approving the Division's plan of termination of parental rights, followed by adoption, at the January 31, 2019 permanency hearing, the judge noted that M.S. failed to comply with services, including an updated psychological evaluation, counseling, and random urine screens. The judge also found the Division made reasonable efforts to reunify Amy with M.S. Thereafter, the Division continued to refer M.S. for parenting classes at the Urban League and counseling services, which she continued to miss. M.S. also failed to attend two appointments for hair follicle testing and five drug screens. She also continued to miss visits with Amy and eight appointments for bonding evaluations.

In March 2019, Robert experienced an hour-long behavioral outburst in which he threatened Mary. The Division arranged for him to participate in therapy at Audrey Hepburn's Children's House (AHCH) and to continue the trauma therapy he received as a sexual abuse victim.

At the guardianship trial before another judge, the Division presented testimony from the adoption caseworker, Miriam Attia, and Dr. Figurelli. Attia

12

testified that M.S. did not respond to her attempts to contact her after July 2019 and verified that M.S. failed to complete court-ordered services. In January 2019, Attia stated that Amy's cardiologist cleared her to play sports, and her medical appointments were reduced to about two per month. According to Attia, by the time of trial, none of Robert's treating professionals at AHCH had recommended his contact with Amy be supervised or stated that he posed a risk of perpetrating future acts against her. Attia confirmed that Mary and Aaron wished to adopt Amy.

The judge qualified Dr. Figurelli as an expert in psychology and substance abuse treatment after counsel stipulated to his expertise. He testified that because M.S. did not attend a psychological evaluation since November 2017, he was unable to render an opinion as to her current parenting ability. Dr. Figurelli expressed his concern about M.S.'s "instability" because of her inability to maintain stable housing or employment. He also opined that M.S. failed to visit Amy or participate in her medical appointments especially in light of her special needs. By failing to attend services recommended, Dr. Figurelli highlighted that M.S. minimized issues of domestic violence.

As to the incident involving Amy and Robert, Dr. Figurelli testified his opinion as to Mary and Aaron would not change because he had no indication

13

they were incapable of providing the required level of supervision. Dr. Figurelli emphasized it was "critical" for Amy to achieve permanency as soon as possible and "it would [not] make any sense" to further delay permanency because M.S. was unlikely to be able to safely parent in the foreseeable future. Delaying permanency was "not a viable situation for" Amy.

With respect to the bonding evaluations he conducted, Dr. Figurelli concluded that Mary and Aaron were Amy's psychological parents, she identified them as "her family," and that they provided her with a "sense of family connectedness." He believed Amy had a "strong and significant" bond with them and would endure "a traumatic emotional loss," which would be "severe and enduring" if she were to lose her relationship with them.

M.S. testified on her own behalf and described the "very good relationship" she had with Amy. At the time of trial, M.S. testified she was not working and lived with her parents but planned to obtain employment and Section 8 housing after her five-year suspension ended because she missed payment of one month's rent. In April 2019, M.S. testified she underwent a splenectomy, "almost died," was hospitalized for three weeks, and was unable to walk for two months thereafter. According to M.S., these were the reasons she missed visits with Amy and did not sign the Division's release form for her

medical records. M.S. acknowledged she did not complete counseling and had not stayed in contact with the caseworker.

The law guardian did not present any witnesses or evidence but supported the Division's application for guardianship of Amy. On November 14, 2019, the judge entered an order terminating M.S. and T.C.'s rights to Amy. He issued a comprehensive written opinion in support of the order. This appeal followed.

II.

"The scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). In general, a trial court's findings "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Particular deference is afforded to family court fact-finding because of the family courts' special jurisdiction and expertise in family matters." N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 367 (App. Div. 2014) (citing Cesare, 154 N.J. at 413). "We will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

To terminate parental rights on the grounds of the "best interests of the child," the Division must prove, by clear and convincing evidence, the following four prongs under N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four standards later codified in Title 30).]

The four statutory prongs "are neither discrete nor separate. They overlap to provide a composite picture of what may be necessary to advance the best

interests of the children." N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005).

Under prong one, the Division must demonstrate harm "that threatens the child's health and will likely have continuing deleterious effects on the child." In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999). The Division need not demonstrate actual harm. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001). That is, courts consider whether the child's safety, health, or development will be endangered in the future. Ibid. Moreover, "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of DMH, 161 N.J. 365, 383 (1999) (citing A.W., 103 N.J. at 616 n.14).

In addition, a parent's failure to provide "a permanent, safe, and stable home" engenders significant harm to the child. Ibid. Likewise, a parent's failure to provide "solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379.

"The second prong, in many ways, addresses considerations touched on in prong one." F.M., 211 N.J. at 451. The focus is on "parental unfitness." K.H.O., 161 N.J. at 352.

Under prong three, the Division must prove it "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home." N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts is defined as "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." N.J.S.A. 30:4C-15.1(c). The record must also establish "the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

Under the fourth prong, the Division must demonstrate that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15(a)(4). The fourth prong serves as a "'fail safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453.

We affirm the trial judge's decision with respect to all four prongs of the statue substantially for the reasons expressed in his written opinion. We add the following comments.

As to prong one, the judge emphasized Amy was a medically fragile child who required heightened care. The record clearly established M.S. is unable to care for Amy's special needs, even though they have lessened. Additionally, the judge was concerned that M.S. left Amy in the care of nurses and caretakers,

and her financial irresponsibility would place Amy "at great risk of harm." M.S. was unable to care for Amy since the January 2016 removal, and therefore, M.S. is unable to provide a "permanent, safe, and stable home." DMH, 161 N.J. at 383. Moreover, M.S. never eliminated the risk of harm to Amy that her care posed.

The judge's finding as to prong one is fully supported by the record. We are unpersuaded by M.S.'s argument that poverty and lack of housing do not constitute abuse or neglect, see e.g., Doe v. G.D., 146 N.J. Super. 419, 430-31 (App. Div. 1967), because the judge here did not base his prong one findings solely on her lack of stable housing. The judge considered M.S.'s failure to fully avail herself of the Division's assistance regarding housing and employment.

As to the second prong, the judge credited Dr. Figurelli's opinion that M.S. was unlikely to parent Amy in the foreseeable future and that M.S. failed to engage in services to meet Amy's needs. The record shows M.S. failed to participate in updated psychological and bonding evaluations, leading the judge to conclude she was "not committed to overcoming the shortcomings and obstacles that prevent[ed] her from being an effective and adequate parent to" Amy. The judge determined a delay in permanent placement would add to Amy's harm.

19

Turning to prong three, we are satisfied the record supports the judge's finding that the Division made "reasonable efforts" to provide appropriate services to M.S. The Division engaged in such efforts dating back to 2013, assisting M.S. with nursing care services for Amy, purchasing a cell phone for M.S., providing her with information on how to apply for Section 8 housing, substance abuse, and parenting skill class referrals.

The last clause of prong three addresses whether "the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). Here, the judge found the Division "extensively explored relatives for placement" and that Mary and Aaron wished to adopt Amy. While the judge applauded K.C. for her interest in parenting Amy, he found she was not a viable placement because K.C.'s relationship with R.G. posed a threat to Amy's safety.

The Division satisfies prong three when it provides services to a parent to help correct the circumstances that led to the child's removal and considers alternatives to termination of parental rights. DMH, 161 N.J. at 386. Reasonable efforts include:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[Id. at 387 (citing N.J.S.A. 30:4C-15.1(c)).]

The court analyzes whether the Division provided reasonable efforts "on an individualized basis," id. at 390, and measures them by their adequacy under the circumstances, rather than by their success. Id. at 393.

Here, the record supports the judge's findings and conclusions regarding prong three. The Division provided defendant with numerous services before Amy's removal to allow M.S. to maintain custody, and after Amy's removal, to allow M.S. to regain custody. The record demonstrates that the services were individually tailored to M.S.'s needs because they aligned with those that Dr. Figurelli recommended.

M.S. does not brief, or otherwise challenge, the issue of whether the Division adequately considered alternatives to termination by assessing relatives, including K.C. As such, she waived this issue on appeal. See, e.g., W.H. Indus., Inc. v. Fundicao Balancins, Ltda, 397 N.J. Super. 455, 459 (App. Div. 2008) ("An issue not briefed is deemed waived."). Even so, the record

supports the finding that the Division met its burden as it assessed M.S.'s parents, Amy's maternal uncle, and K.C., and ruled them out.

In her reply brief, for the first time, M.S. questions whether Mary and Aaron are fully committed to adopting Amy—M.S. notes that Mary and Aaron did not testify and contends that Attia's testimony regarding their wishes was hearsay. M.S. did not address this issue below, therefore, the matter is subject to the plain error standard of review. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . .").

The record does not contain any evidence that Mary and Aaron's preference for adoption is conditional, ambiguous, or qualified. We discern no error under Rule 2:10-2 and conclude the judge provided a reasonable basis for his conclusion on prong three.

Finally, we address the fourth prong. The judge again credited Dr. Figurelli's testimony that Amy would experience severe and enduring harm if her relationship with Mary and Aaron was terminated. Moreover, the judge found the Division proved prong four because although it did not have a bonding evaluation between M.S. and Amy, M.S. did not visit Amy since August 2019, and had a history of missing visits. Prudently, the judge proceeded "with great

caution" because Amy was finally in the care of a family that was both willing and able to care for her.

The fourth prong "serves as a failsafe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). The Division typically satisfies this prong through testimony of a qualified expert, who conducts a comprehensive and objective evaluation of the child's relationship with his or her biological parents and resource parents. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007).

Children have their own rights to "a stable, nurturing environment," along with the security of knowing that their "most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. "Keeping the child in limbo, hoping for some long-term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 484 (App. Div. 2012) (quoting A.G., 344 N.J. Super. at 438).

We conclude the judge provided a reasonable basis for his conclusion on prong four that the termination of M.S.'s parental rights will not do any more harm than good under N.J.S.A. 30:4C-15.1(a)(4). The record does not support M.S.'s contention that Mary and Aaron treat Amy poorly, or that their home is a

"house of horrors." To the contrary, the evidence shows Amy is thriving in their home and "appeared to feel emotionally supported, safe, cared for, and emotionally secure in interaction." Amy did not exhibit "emotional conflicts, emotional upset, or evidence of emotional disturbance in her relationship" with Mary and Aaron. The judge's decision is based upon substantial credible evidence in the record.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1373-19