# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3266-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

F.B.,

     Defendant-Appellant,

and

S.D. and S.B.,

     Defendants.

_____

IN THE MATTER OF N.B.
AND J.B., Minors.

_____

Submitted March 22, 2021 – Decided April 12, 2021

Before Judges Fasciale and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0346-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Victor E. Ramos, Assistant Deputy Public Defender, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors N.B. and J.B. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant F.B. (the mother) appeals from a December 10, 2019 order finding that she abused and neglected N.B. (the child).[1] After hearing testimony from the mother and a Division of Child Protection and Permanency (DCPP) caseworker, Judge Garry J. Furnari entered the order under review, rendered an oral opinion, and found by a preponderance of the evidence that the mother failed to provide for the child upon his discharge from a hospital stay and ensure

---

[1] The mother also included a March 11, 2020 order terminating the litigation in her Notice of Appeal.

2

A-3266-19

that the child attended all his therapies, which were meant to assist with his recovery from a brain aneurysm. We affirm.

The child was born in 2006 and is currently fourteen years old. In January 2019, the child began complaining of a headache and passed out shortly after. He was rushed to University Hospital in Newark and diagnosed with a brain aneurysm. The child underwent an eighteen-hour surgery and was placed in a medically induced coma for three weeks. In February 2019, he was transferred to Children's Specialized Hospital (CSH) in New Brunswick for rehabilitative services. While at CSH, the child received physical, occupational, speech, recreational, and child life therapies. His physical therapy treatment was "focus[ed] on improving his strength, balance, coordination, and functional mobility skills[.]" The child exhibited weakness in his right upper extremities as well as balance and coordination issues, but displayed notable improvements after continued therapy sessions. Speech therapy improved his expressive language skills and vocal quality, but he still experienced issues with his memory and "continued to benefit from cues to recognize unsafe events [and] recognize and solve problems."

CSH staff educated the mother on safety awareness and trained her to assist the child with walking, climbing stairs, and transferring in and out of a

3

wheelchair. The mother acknowledged that she understood the assistance the child required and did not ask questions. CSH also explained to the mother that the child would need ongoing therapy and in-home school instruction. CSH scheduled the child's post-discharge appointments, informed the mother of the appointments, and explained that she would need to follow up with the child's school to set up in-home instruction. On March 20, 2019, CSH released the child to the mother's custody.

Over the following weeks, the mother failed to bring the child to several of the scheduled therapy appointments. The mother failed to bring the child to his first six neuropsychologist appointments, brought him to one appointment in May 2019, and then again failed to attend until June 2019.[2] She also failed to bring the child to a scheduled physical therapy evaluation, which was rescheduled five times, before eventually bringing the child to be evaluated. This delayed the child's physical therapy sessions until June 2019, which the mother did not attend. The mother also did not bring the child to his occupational therapy appointments between April and May 2019, even after rescheduling from morning to afternoon appointments as well as scheduling

[2] The child's neuropsychologist explained that the delay in beginning the child's therapies diminished the likelihood that he would recover full use of the right side of his body.

4

Saturday appointments at the mother's request. The child's appointments were eventually moved to a location closer to the mother's home, but she continued to fail to bring the child to the appointments, resulting in the facility refusing to schedule more appointments.

The child was scheduled for and attended an MRI with a neurosurgeon, but it could not be conducted because the mother disregarded the neurosurgeon's instructions that the child not eat prior to the MRI. The neurosurgeon rescheduled and later completed the MRI. The neurosurgeon also scheduled an angiogram to check the child's brain for "any [arteriovenous malformations] that needed to be taken out[] to prevent another brain rupture," and the neurosurgeon explained to DCPP that "an additional rupture could be fatal, which is why it was important to see if there are any other blood vessels that can burst inside of [the child]'s head." The mother failed to bring the child to the hospital to complete required pre-operative blood work. As a result, the angiogram needed to be rescheduled.[3]

The mother explained to the DCPP caseworker that she did not take the child to the neuropsychologist or the physical therapist "because [she's] not

---

[3] After DCPP obtained care and supervision of the child in June, the child attended his rescheduled angiogram in July.

smiling in these people[s] face[s] after they called [DCPP] on [her]." She told the caseworker that "she was unaware of all of the appointments, and some of the appointments were overlapping," and that CSH "never bothered to ask her if those appointment dates worked for her or not." The mother also expressed skepticism as to whether the child needed the therapies, asking the caseworker "what if I feel that he doesn't need all of these services?" and "so if they say he needs all of this therapy, I have to take him?"

On June 28, 2019, DCPP obtained care and supervision of the child and his sibling. On August 12, 2019, DCPP completed its investigation and determined that it was "substantiated" that the mother was medically negligent. N.J.A.C. 3A:10-7.3(c)(1). DCPP also concluded that it was "not established" that the mother was educationally negligent. N.J.A.C. 3A:10-7.3(c)(3) The mother was required to undergo a psychological evaluation, wherein the psychologist determined that "[a]t this point, it does not appear that [the mother] is consistently capable of being left to her own judgment and independent resources—without assistance—to ensure that [the child] receives the services he requires" and that her conduct "created circumstances that could have led to serious and enduring harm to [the child]."

6

On December 10, 2019, Judge Furnari conducted a factfinding and compliance hearing, where he heard testimony from the mother and the DCPP caseworker. The judge summarized his findings, which supported his conclusion that the mother abused and neglected the child:

> In January 2019, [the child] suffered a brain aneurism resulting in his hospitalization for several months. Upon discharge, he was scheduled for follow-up services, including speech therapy, occupational therapy, an[d] physical therapy, as well as a surgical intervention to detect any additional problems in his brain. [The mother] failed to ensure that [the child] attended the appointments and surgery. [The mother] also failed to ensure that [the child] received in-home schooling, because she did not obtain the necessary prescription from [the child's] pediatrician. [The child's] medical providers indicated that the failure to receive timely follow-up treatment put [the child] at risk that his functions might not return fully, and the failure to have the surgery put him at risk of death should another brain aneurism arise.

On appeal, the mother raises the following points for this court's consideration:

POINT I

THE CIRCUMSTANCES ATTENDANT TO [THE MOTHER'S] INABILITY TO CONSISTENTLY BRING [THE CHILD] TO MEDICAL SERVICES FOLLOWING HIS HOSPITAL DISCHARGE AND PRECEDING DCPP'S INVOLVEMENT WITH THE FAMILY DID NOT RISE TO THE REQUISITE LEVEL OF GROSS NEGLIGENCE OR

7

RECKLESSNESS NOR WAS [THE CHILD] AT A[N] IMMINENT DANGER OF BECOMING IMPAIRED AS REQUIRED TO UPHOLD MEDICAL NEGLECT PURSUANT TO N.J.S.A. 9:6-8.21(c)(4)(a)[.]

A. The Delay and Inconsistency in Getting [The Child] To Medical Services Did Not Rise to The Degree of Gross Negligence Given CSH's Failure to Coordinate and Better Communicate the Post Discharge Services to [the Mother], [the Mother's] Limited Means, Lack of Transportation, Lack of Parental Support and Delays with CSH's Medical Transportation Services.

B. The Circumstances of This Case Did Not Fall Within the Required Imminence Needed to Satisfy that Element of Medical Neglect Under N.J.S.A. 9:6-8.21(c)(4)(a); Nor in the Absence of Evidence to the Contrary Should the Imminence of Impairment Be Presumed.

Our review of a family judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1988). The general rule is that findings by the family judge are binding on appeal when supported by adequate, substantial, credible evidence. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). This is because the judge "ha[d] the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; [the judge] has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of

Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).  This court will not disturb the family judge's findings of fact unless they are "so wide of the mark that the judge was clearly mistaken."  N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)).

"Title 9's purpose is clear: to protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from further injury and possible death.'"  N.J. Dept. of Children and Families v. A.L., 213 N.J. 1, 18 (2013) (quoting N.J.S.A. 9:6-8.8(a)).  An "abused or neglected child," as defined by N.J.S.A. 9:6-8.21(c)(4), is a child who is less than eighteen years of age and

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . or by any other acts of a similarly serious nature requiring the aid of the court[.]

"Whether a parent or guardian has failed to exercise a minimum degree of care' in protecting a child is determined on a case-by-case basis and analyzed in light of the dangers and risks associated with the situation." N.J. Div. of Child Protection and Permanency v. E.D.-O, 223 N.J. 166, 178 (2015) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999)). The phrase "'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S., 157 N.J. at 178. "[A] guardian [or parent] fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181.

A parent's inaction or unintentional conduct may amount to a finding of abuse or neglect if there is evidence that the child was injured as a result. Id. at 175-77. A judge "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." E.D.-O, 223 N.J. at 178 (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)). "[I]n child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the [child]. One act may be 'substantial' or the sum of many acts may be 'substantial.'" N.J. Div. of Youth and Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010) (second alteration in

10

original) (quoting N.J. Div. of Youth & Family Servs. v. C.M., 181 N.J. Super. 190, 201 (App. Div. 1981)).

After hearing testimony from the DCPP caseworker and the mother, the judge explained that he found the caseworker "quite credible," and "did not find [the mother] to be completely incredible." Specifically, the judge did not find the mother credible when she asserted that "[t]he doctors really didn't tell [her] how important it was to do all of these services immediately . . . when [the] child still has deficits and [the mother has] been caring for him," and found it "more likely that the hospital did tell [her] and that [she was] aware." The judge noted that the circumstances surrounding the child's care "really wasn't fitting into what [the mother] thinks ought to happen and the convenience for herself," and that "during that period of time [the mother] was making very poor decisions about the care of [the] child. And [the mother] failed to provide for the care of [the] child as . . . would be expected."

While the judge noted that "some of" the mother's conduct may not be negligent, "the magnitude of the things that she did before [DCPP's] intervention and immediately after . . . essentially underscores that the things that she did before were more than just negligent." The judge explained that a child "can be neglected where the mother or the father failed to exercise the minimum degree

of care although they are aware of the imminent danger" and that "during this period of time [the] mother failed pretty miserably to meet her obligations to make sure that the child was protected." The trial judge's determination was not "so wide of the mark" that it was "clearly mistaken." G.L., 191 N.J. at 605 (citing J.T., 269 N.J. Super. at 188-89).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3266-19